[No. 29580-0-III.　Division Three.　March 15, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. STEPHANIE ANNE
STRONG, *Appellant*.

*David L. Donnan* and *Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Steven J. Tucker, Prosecuting Attorney*, and *Mark E. Lindsey, Deputy*, for respondent.

¶1 Siddoway, J. — Stephanie Strong appeals her conviction of second degree extortion. She argues that the conduct prosecuted in her case—demanding payment from a public servant in exchange for silence about the public servant's wrongdoing—is no different from accepting payment to settle and hold in confidence embarrassing facts underlying a threatened lawsuit. She insists that the First Amendment protects the party demanding payment in either case. We disagree and affirm her conviction.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Stephanie Strong's indictment and arrest for federal bank fraud in 2008 brought her into contact with Velven York, a corrections officer at the Spokane County Jail. She was housed on the floor to which Mr. York was assigned for many months, and the two became friendly. After Ms. Strong was convicted and was transferred to a federal facility to serve her sentence, Mr. York maintained contact with her

family and eventually sent a letter to Ms. Strong in prison. When Ms. Strong returned to Spokane to complete her sentence in a federal work-release facility, Mr. York renewed contact, texting or speaking to her frequently, driving her to counseling appointments, and buying her dinner. He paid off several of Ms. Strong's fines and other expenses, which totaled more than $2,000. Although both testified that their relationship never became romantic, they both knew that Mr. York's conduct violated county policy, which strictly forbade corrections officers from fraternizing with current or former inmates.

¶3 On June 27, 2010, a Sunday evening, Mr. York received a call on his cell phone from a male caller who stated, " 'Hey, I know you're having girl troubles at work.' " 2 Report of Proceedings (Nov. 16, 2010) at 175. The caller went on to say he was aware Mr. York was giving rides to an inmate in a federal halfway house and " 'here's what I want. I want $5000,' " and hung up. *Id.* at 176. Mr. York called Ms. Strong and told her about the call.

¶4 Shortly thereafter, Mr. York received a second call from the same male caller. This time, the caller demanded that Mr. York bring $5,000 cash to Dick's Hamburgers, a Spokane drive-in restaurant, at 3:45 the next afternoon. The caller said that Mr. York should buy a particular type of hamburger (presumably for its recognizable bag), eat it, put the cash in the bag, and then leave the bag by a designated trash can. Mr. York again called Ms. Strong and told her about the second call. Mr. York and Ms. Strong spoke by phone several times that evening about the threat and what he should do. Ms. Strong counseled Mr. York that he should pay the money.

¶5 Instead, Mr. York decided the next morning to notify his supervisors at the jail, who contacted police. Eight to 10 officers set up surveillance at the appointed time and watched as Mr. York made a stop at a bank to feign withdrawing the $5,000, traveled to the drive-in restaurant, bought the hamburger, returned to his car to eat it,

placed an empty envelope into the bag, and then placed the bag near the designated garbage can. After Mr. York left the parking lot, officers saw Douglas Mobley walk to the trash can and pick up the bag. Officers immediately arrested Mr. Mobley, who turned out to be Ms. Strong's boyfriend. They also detained Ms. Strong, who they had seen arrive at the restaurant with Mr. Mobley and then conceal herself from view behind bushes at a neighboring building.

¶6 Mr. York resigned his position with the county to avoid being fired for the violation of policy.

¶7 Ms. Strong was charged with second degree extortion as an accomplice. She testified at trial that in her last conversation with Mr. York about the extortion threat he indicated he did not intend to comply with the caller's demands. She claimed she and Mr. Mobley traveled to Dick's at the appointed drop time out of curiosity, never expecting Mr. York to be there. She testified she had no involvement in the extortion and never saw Mr. Mobley pick up the bag. The jury did not believe her. She was convicted and sentenced to 55 months' confinement.

¶8 She appeals, arguing that Mr. Mobley's speech, threatening to disclose only truthful information and not a "true threat" within the meaning of First Amendment jurisprudence, is constitutionally protected. She argues that she cannot be convicted as an accomplice to something that is not a crime.

## ANALYSIS

¶9 The State must prove each element of a crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Ms. Strong argues that the State presented insufficient evidence that the threat conveyed to Mr. York by Mr. Mobley was unprotected speech under the First Amendment.

¶10 Whether the crime of extortion in the second degree requires proof of a "true threat" within the meaning

adopted by our Supreme Court in *State v. Williams*, 144 Wn.2d 197, 26 P.3d 890 (2001) is a question of law that we review de novo.

¶11 If Ms. Strong's conviction may have been based on protected speech, we conduct an independent examination of the entire record " 'to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure [that] protected expression will not be inhibited.' " *State v. Kilburn*, 151 Wn.2d 36, 50, 84 P.3d 1215 (2004) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)).

I

¶12 As a threshold matter, the State argues that Ms. Strong was charged as an accomplice and the speech for which she claims protection—the extortionate threat—was not her own. It argues that since her speech was not at issue, there is no First Amendment issue she can raise.

¶13 As framed by Ms. Strong, however, the issue is whether she can be convicted as an accomplice if no underlying crime occurred. An accessory may be convicted of the underlying offense even though he or she is the only one charged, if there is proof the crime was committed. *State v. Mora*, 110 Wn. App. 850, 859, 43 P.3d 38, *review denied*, 147 Wn.2d 1021 (2002); *State v. Dault*, 25 Wn. App. 568, 573, 608 P.2d 270, *review denied*, 93 Wn.2d 1030 (1980). However, "[e]ven though the accessory may be tried and convicted as principal, either before or after the principal actor, he may not be convicted in the absence of proof that the one to whom he is charged as accessory actually committed the crime." *State v. Nikolich*, 137 Wash. 62, 66-67, 241 P. 664 (1925); *State v. Taplin*, 9 Wn. App. 545, 547, 513 P.2d 549 (1973). We agree with Ms. Strong that if Mr. Mobley's conduct was no crime, because protected by

the First Amendment, then she cannot be convicted as an accessory.

## II

■ ¶14 "The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (alteration in original). A state criminal law "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S. Ct. 1184, 170 L. Ed. 2d 151 (2008)).

¶15 Ms. Strong argues that RCW 9A.56.130, defining the crime of "extortion in the second degree," is constitutionally overbroad in criminalizing threats that enjoy First Amendment protection. But she does not ask us to invalidate the statute on that basis; she asks, instead, that we construe it to require proof of a true threat, which she argues is essential to preserve its constitutionality. Ms. Strong argues that a true threat was not established by the State's evidence in this case.

■ ¶16 A limiting construction of a State's definition of a crime is sometimes required by the canon of constitutional avoidance, an interpretive tool that the United States Supreme Court has counseled so that "ambiguous statutory language be construed to avoid serious constitutional doubts." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 516, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009). But adopting a limiting construction is appropriate only if the statute is readily susceptible to the limiting construction; rewriting a law to conform it to constitutional requirements would constitute a serious invasion of the

legislative domain. *Stevens*, 559 U.S. at 481 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 884, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 479 n.26, 115 S. Ct. 1003, 130 L. Ed. 2d 964 (1995)).

¶17 The United States Supreme Court's recent First Amendment jurisprudence provides that " '[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.' " *Id.* at 474 (alteration in original) (quoting *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008)). The second step is to examine whether the statute as construed criminalizes a substantial amount of protected expressive activity. *Williams*, 553 U.S. at 297. We conduct the two steps of the analysis in turn.

A

¶18 Washington defines "extortion" as knowingly to obtain or attempt to obtain by threat property or services of the owner. RCW 9A.56.110. Extortion committed by means of a threat to inflict bodily harm or take the life of another constitutes extortion in the first degree. RCW 9A.56.120.

¶19 A person is guilty of extortion in the second degree if she commits extortion by means of other specified wrongful threats; in Ms. Strong's case, the charge was that she committed extortion by means of a threat to substantially harm Mr. York with respect to his health, safety, business, financial condition, or personal relationships. Clerk's Papers at 5; RCW 9A.56.130; former RCW 9A.04.110(27)(j) (2007). Other threats qualifying as "wrongful" for purposes of a charge of extortion in the second degree are threats (1) to accuse any person of a crime or cause criminal charges to be instituted against any person; (2) to expose a secret or publicize an asserted fact, whether true or false, tending to

subject any person to hatred, contempt, or ridicule; (3) to reveal any information sought to be concealed by the person threatened; (4) to testify or provide information or withhold testimony or information with respect to another's legal claim or defense; (5) to take wrongful action as an official against anyone or anything, or wrongfully withhold official action, or cause such action or withholding; or (6) to bring about or continue a strike, boycott, or other similar collective action to obtain property that is not demanded or received for the benefit of the group that the actor purports to represent. Former RCW 9A.04.110(27)(d)-(i).

¶20 The gravamen of the common law crime of extortion—a crime against the administration of justice—is a corrupt taking of a fee by a public officer. *See* 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 20.4, at 197 (2d ed. 2003). In its modern form, statutory extortion, a crime in practically every state, "is, of course, closely related to the crime of robbery, having in fact been created in order to plug a loophole in the robbery law by covering sundry threats which will not do for robbery." *Id*. § 20.4(a) at 198 & n.3, § 20.4(b) at 203. The central importance to the crime of nonspeech conduct—the wrongful acquisition or attempted acquisition of another's property—takes extortion outside the category of pure speech.

¶21 The overbreadth doctrine's concern with chilling protected speech "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973). " '[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Cox v. Louisiana*, 379 U.S. 559, 563, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S. Ct. 684, 93 L. Ed. 834 (1949)).

¶22 Where a regulated activity involves elements of both speech and conduct, the intermingling of protected and

unprotected elements permits subjecting the activity to controls that would not be constitutionally permissible in the case of pure speech. *Amalgamated Food Emps. Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 314, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968) (picketing), *overruled on other grounds by Hudgens v. Nat'l Labor Relations Bd.*, 424 U.S. 507, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976). When "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567, 111 S. Ct. 2456, 115 L. Ed. 2d 504 (1991) (quoting *United States v. O'Brien*, 391 U.S. 367, 376-77, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968)).

¶23 Washington courts performing overbreadth analysis have examined whether a statute's objective is to regulate conduct, with only an incidental impact on speech. Such statutes are less likely to be invalid—chilling, at most, incidental speech, "uttered during lawless conduct." *State v. Talley*, 122 Wn.2d 192, 211, 858 P.2d 217 (1993) (reviewing challenge to hate crime statute). In *State v. Dyson*, 74 Wn. App. 237, 243, 872 P.2d 1115, *review denied*, 125 Wn.2d 1005 (1994), the court observed that the statute defining the crime of telephone harassment was "clearly directed against specific conduct — making telephone calls with the intent to harass, intimidate, or torment another," although at the same time using lewd, profane, or other offensive language identified by the statute. It noted that "[b]ecause the requisite intent establishes the criminality of the communicative conduct, any impact . . . on speech is insubstantial." *Id.*

¶24 The criminal code's provisions criminalizing second degree extortion and identifying the types of threats that satisfy its required element of a wrongful threat therefore cover a type of theft, carried out by means of language.

B

¶25 Having determined what the challenged provisions cover, we address Ms. Strong's contention that they criminalize a substantial amount of protected expressive activity. She argues that they do, by criminalizing threats that fall short of true threats within the meaning of First Amendment jurisprudence.

¶26 The significance of true threats in the First Amendment context was first identified in *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969), which reviewed Robert Watts' conviction of threatening Lyndon B. Johnson for statements made by Watts at an antiwar rally.[1] The Supreme Court reversed the conviction, stating that a statute "which makes criminal a form of *pure speech*, must be interpreted with the commands of the First Amendment clearly in mind" and, in the case of the statute under which Mr. Watts was convicted, must distinguish true "threats" from political hyperbole. 394 U.S. at 707 (emphasis added). In *Williams* our Supreme Court adopted a definition of "true threat" that emerged in the wake of *Watts*, as " 'a statement made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual]." ' " *Williams*, 144 Wn.2d at 207-08 (alterations in original) (quoting *State v. Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797, *review denied*, 136 Wn.2d 1029 (1998) (quoting *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir.), *cert. denied*, 498 U.S. 986 (1990))).

---

[1] In a break-out discussion group at a public rally taking place during the Vietnam War, Watts stated that he had received his draft classification as 1-A and had to report for his physical, and " 'I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' 'They are not going to make me kill my black brothers.' " 394 U.S. at 706.

¶27 As with the federal law at issue in *Watts*, the misdemeanor criminal harassment statute examined in *Williams* criminalized pure speech. *Id*. at 207. "Criminal harassment" was defined to include a threat " '[m]aliciously to do any . . . act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety.' " *Id*. at 203 (emphasis omitted) (quoting former RCW 9A.46.020(1)(a)(iv) (1992)). The court found the statute unconstitutionally vague and overbroad in criminalizing not only true threats but even threats intended to harm a person's mental health; "mental health" was undefined.

¶28 Ms. Strong argues that only a true threat can suffice, constitutionally, for conviction, but every case she cites concerns a law that regulates pure speech. She relies on *Kilburn*, 151 Wn.2d at 41, which examines Washington's felony harassment statute, a statute that the court finds as a threshold matter "criminalizes pure speech." She cites *State v. Johnston*, 156 Wn.2d 355, 360, 127 P.3d 707 (2006), which construes a bomb threat statute that the court likewise observes "regulates pure speech."

¶29 Laws that regulate criminal conduct as to which speech is incidental are distinguishable. If the nonspeech conduct is a sufficient basis for criminal punishment, the fact that the incidental speech falls short of a true threat does not present a constitutional problem. "[E]xtortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all." *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975), *cert. denied*, 424 U.S. 955 (1976); *accord United States v. Hutson*, 843 F.2d 1232, 1235 (9th Cir. 1988). "Although the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.' " *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 420, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (Stevens, J., concurring) (alteration in original)

(quoting Frederick Schauer, *Categories and the First Amendment: A Play in Three Acts*, 34 VAND. L. REV. 265, 270 (1981)). In holding unconstitutional a coercion ordinance that it found to be overbroad, Division One of our court recognized that extortion statutes are generally upheld as constitutionally valid, on the basis that extortion requires the unlawful compelling of the victim to give up property; it is an extension of theft. *City of Seattle v. Ivan*, 71 Wn. App. 145, 154, 856 P.2d 1116 (1993) (citing *State v. Robertson*, 293 Or. 402, 418-20, 649 P.2d 569 (1982)).

¶30 Ms. Strong raises one viable issue of First Amendment concern, but one that was addressed by our Supreme Court in *State v. Pauling*, 149 Wn.2d 381, 69 P.3d 331, *cert. denied*, 540 U.S. 986 (2003). She posits that

> [c]ivil suits are often resolved with a payment in turn for an agreement not to disclose details of the settlement. Civil suits, too, are often initiated with a demand letter seeking payment in return for an agreement not to sue.

Br. of Appellant at 9. Demand for payment in satisfaction of a legal claim is not wrongful conduct. We agree that if any threat accompanying such a demand were to be treated as a crime, the First Amendment would require that it be a true threat. But this argument for overbreadth was squarely presented in *Pauling* and our Supreme Court addressed it by adopting a limiting construction that removed the danger to constitutionally protected expression. The court limited the crime of extortion to threats that are inherently wrongful as lacking any nexus to a plausible claim of right. It relied upon the limiting construction of a federal extortion statute, 18 U.S.C. § 875(d), arrived at by the Second Circuit Court of Appeals in *United States v. Jackson*, 180 F.3d 55, *superseded on reh'g*, 196 F.3d 383 (2d Cir. 1999), *cert. denied*, 530 U.S. 1267 (2000). We find no case that has improved upon *Jackson*'s explanation of the limiting construction:

> Where there is no plausible claim of right and the only leverage to force the payment of money resides in the threat,

where actual disclosure would be counterproductive, and where compliance with the threatener's demands provides no assurance against additional demands based on renewed threats of disclosure, we regard a threat to reputation as inherently wrongful. We conclude that where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim of right, or where the threat has no nexus to a plausible claim of right, the threat is inherently wrongful and its transmission in interstate commerce is prohibited by § 875(d).

180 F.3d at 71.

¶31 Ms. Strong acknowledges *Pauling* but mistakenly argues that its limiting construction of extortion in the second degree does not solve the constitutional infirmity. She argues, first, that a prospective plaintiff's "good faith belief" in the merit of his or her threatened suit is not enough to constitute a claim of right, leaving the plaintiff vulnerable to a charge of extortion. Br. of Appellant at 9. She reads the nexus requirement too narrowly. If a prospective plaintiff threatening litigation has or reasonably believes he or she has a claim of right, or threatens litigation with a nexus to a plausible claim of right, the threat falls outside the scope of the extortion statute. *Pauling* does not require that the claim of right be proved.

¶32 Ms. Strong's second argument that *Pauling* does not solve the constitutional problem is that "the words themselves, the threat, may nonetheless be constitutionally protected speech. . . . Thus, regardless of whether one has a claim of right to the property sought, so long as the threat is constitutionally protected speech, the person cannot be criminally sanctioned." *Id.* Her error here, as discussed earlier, is in assuming that a threat falling short of a true threat is always protected from criminal punishment. A threat falling short of a true threat will be protected from punishment as pure speech. *Watts*, 394 U.S. at 707; *Williams*, 144 Wn.2d at 207. But when the threat is a part of

verbal and other conduct whose criminal punishment can be justified independent of the speech, the wrong, collectively, is not guaranteed protection from criminal punishment. It is not protected from punishment as extortion in the second degree.

## III

¶33 Finally, Ms. Strong argues that because she has raised a First Amendment claim, we must engage in independent review of the record, " 'so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Kilburn*, 151 Wn.2d at 50 (internal quotation marks omitted) (quoting *Bose*, 466 U.S. at 508). The constitutionally-warranted independent review is factual review, limited to "those 'crucial' facts that necessarily involve the legal determination whether the speech is unprotected." *Id.* at 52.

¶34 The evidence at Ms. Strong's trial was undisputed that Mr. Mobley threatened to disclose Mr. York's career-ending violations of the county's fraternization policy unless he was paid the $5,000 he demanded. On this evidence, Ms. Strong's conviction as an accessory does not punish speech protected by the First Amendment.

¶35 We affirm.

SWEENEY and BROWN, JJ., concur.

Review denied at 174 Wn.2d 1018 (2012).