# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77982-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| JEREMY WILLIAM DAWLEY, | ) | |
| | ) | FILED: December 30, 2019 |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Jeremy Dawley asserts a facial challenge to

RCW 9A.76.180, the intimidating a public servant statute. Specifically, Dawley

argues the statute is unconstitutionally overbroad because it restricts a substantial

amount of protected speech. Dawley contends the statute must be limited to true

threats, serious expressions of the intention to inflict bodily harm upon or to take

the life of another. Because the statute is a content based restriction on pure

speech, it is subject to strict scrutiny and must be narrowly tailored to serve

compelling state interests. We agree with Dawley that the statute is not narrowly

tailored unless limited to true threats alone. Because the State concedes, and we

agree, that there is insufficient evidence that Dawley made a true threat, we

reverse his convictions for intimidating a public servant.

## FACTS

In 2012, Dawley was discharged from the United States Navy after suffering a traumatic brain injury. Dawley lived in Oak Harbor. At night, Dawley regularly went on long walks with his friend, Efrain Palacios. Palacios and Dawley frequently called the Island County Communications (I-COM) nonemergency line to report traffic issues, parking violations, and other complaints.

Between October and December 2016, Dawley complained to Kevin Dresker, the Oak Harbor chief of police, and Nikki Esparza, the city attorney, about the level of officer discretion in addressing his complaints. Dawley was also frustrated with the officer response time.

On the evening of January 8, 2017, Palacios and Dawley went for a walk. Dawley called I-COM to report two illegally parked cars. The dispatcher requested that Dawley wait at his current location to talk with the responding officer. Officer Patrick Horn arrived and found Dawley sitting on a stump. Dawley had his service dog with him. Officer Horn shined his spotlight on Dawley.

Officer Horn suggested that Dawley "carry a notebook with him so he could notate different violations that he saw and then he could give [I-COM] a call and to let us know what all those were" at one time.[1] While Officer Horn and Dawley were talking, another officer pulled up. Dawley became agitated. At trial, Officer Horn testified:

---

[1] Report of Proceedings (RP) (Dec. 6, 2017) at 348.

2

[Dawley] then told me not to get out of my patrol car or else his dog would attack. And I told Mr. Dawley if he let his dog attack me, I would be forced to shoot his dog. And he stated that he was aware of self-defense laws and that if I shot his dog, that he would in turn stab me. And that's when [the other officer] made the statement to him, "If you stab my partner, I'm going to have to shoot you."[2]

On January 9, the day after the incident, Dawley left the following voicemail for Chief Dresker:

This is Jeremy Dawley again. I'm not getting a phone call back from you. So do I need to look up your address and literally show up at your house 'cause I'm that not afraid of you, and I'm that pissed off at your police officer. Um, I need something done about last night. . . . Is that how you guys do business? You and I, I thought we had good terms but apparently, that just went to shit last night, so true colors came out. So I want to know what the hell you want me to do. Like is this just like a personal thing, like I just have to handle it myself? Or are you going to take my complaint serious at some point? Like where do you want this to stop? . . . I was the guy who was almost shot by the police department because I want people to start acting right. So if you could give me a call back that would be awesome. Thank you.[3]

After listening to the voicemail, Chief Dresker called Dawley. Chief Dresker did not record the subsequent phone call, but he testified:

Mr. Dawley was upset with the officers and the contact he had with [Officers Horn] [a]nd he pretty quickly went to the fact that he was going to look up my information, information on my family and the city attorney, and that he would seek out certain groups to provide that information to . . . .

. . . .

---

[2] Id. at 353.

[3] Ex. 1.

. . . He said he was going to use . . . Green Beret tactics, and then he further explained that he would get the local populace to take the action so he wouldn't have to . . . .

. . . .

. . . [H]e wanted certain actions to take place, and he wanted them—quick responses. And these are these calls of the bushes and parked cars and those things and that he wasn't getting that, he wasn't happy, and that I wasn't doing anything about it.[4]

Also on January 9, Chief Dresker spoke to the city attorney, Esparza, about the comments Dawley made concerning her and her family. Esparza called Dawley while Chief Dresker was present. Dawley allowed Esparza to record the phone call. During that call, Dawley said:

I really think something needs to be done about this. . . . So, I mean, it's completely up to you. But if you guys aren't willing to draw the line, like I'm gonna protect myself. I'm not saying I'm gonna come after you guys 'cause that's—I'm not a murderer, I'm a law-abiding citizen. . . .

Thank you much for making me feel unsafe in my community that I've never done anything wrong in. I hope you feel safe though. You feel safe, ma'am? Do you feel safe at your house when you go to sleep?[5]

Esparza asked Dawley about his phone call with Chief Dresker. Dawley stated, "I just said that I felt others in the community would like to know your whereabouts, your picture, the picture of your children. I mean, that's legal. I can do that."[6] Dawley went on to say, "[I]t's a community improvement project, you

---

[4] RP (Dec. 6, 2017) at 239-41.

[5] Ex. 2 at 0:23-1:02.

[6] Id. at 1:23-1:30.

know. It's a Green Beret tactic where you teach the locals, so it's nothing illegal. I'm not obligating or even insisting that they do anything illegal. All I'm doing is I told them I would provide the information."[7] When Esparza clarified Dawley's statements, he stated:

> I can educate whoever I like on any matter of personal defense, offensive offense. That's not illegal, so you cannot be upset about that. And as far as providing your picture and stuff, they already know who you are. So I'm not doing anything illegal. I'm not saying I'm gonna ask 'em to go and do anything illegal to you, no. I didn't do anything like that.[8]

Dawley indicated that he wanted Esparza "to do [her] job. The same thing with the police chief."[9] Dawley also indicated:

> And I don't want to be assaulted by, assaulted by your police officers, killed by your police officers, otherwise harassed by your police department. Your ICOM dispatch is going to continue to take my complaints. They're not illegal, they're not ill founded.[10]

Later in the same phone call, Dawley stated:

> [L]et's just say hypothetically . . . I was going to say, "Hey, you know what, I'll do a direct mailing to the pedophiles and the rapists and the violent offenders, and I'll have 'em sent to your house because . . . you make me feel unsafe. I can't defend myself. . . .You're in your home, you have your gun, you're comfortable, you're not on the street, you know what to do if somebody approaches your home. No, that's not right, that's not what you did to me. And what you did to me as a city is you made me feel completely unsafe, not once but twice now. Your officers have put me into killing range with a firearm. A firearm, ma'am! What happens if I came to your house

---

[7] Id. at 2:16-2:30.

[8] Id. at 2:43-3:05.

[9] Id. at 4:25-4:27.

[10] Id. at 4:30-4:40.

and I put you into killing range with a firearm, right? You'd be upset.[11]

On January 10, Dawley filed a public record request at the Oak Harbor Police Department. He sought records on "[v]iolent offenses that resulted in physical harm and offenders to include sexual assaults."[12] Chief Dresker arrested Dawley after Dawley filed the request.

The State charged Dawley with three counts of intimidating a public servant and one count of telephone harassment. The jury convicted Dawley of two of the counts of intimidating a public servant and the single count of telephone harassment.

Dawley appeals his convictions for intimidating a public servant.

## ANALYSIS

### I. Constitutionality of RCW 9A.76.180

Whether a statute is unconstitutionally overbroad under the First Amendment presents a question of law that we review de novo.[13]

> Because of the important rights protected by the First Amendment, the overbreadth doctrine allows a litigant to challenge a statute on its face, rather than as applied to his own facts, and have a statute invalidated for overbreadth where it would be unconstitutional as applied to others even if not as applied to him.[14]

---

[11] Id. at 11:34-12:37.

[12] Ex. 28.

[13] State v. Immelt, 173 Wn.2d 1, 6, 267 P.3d 305 (2011) .

[14] State v. Motherwell, 114 Wn.2d 353, 370-71, 788 P.2d 1066 (1990).

6

Usually, "[t]he party challenging an enactment bears the burden of proving its unconstitutionality."[15] But in the context of a First Amendment challenge, the State "bears the burden of justifying a restriction on speech."[16]

As a threshold matter, we must consider whether the statute reaches constitutionally protected speech. First Amendment protection does not extend to certain types of speech, including true threats,[17] fighting words, and obscenity.[18] "A 'true threat' is a statement made 'in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual].'"[19] If a statute regulates only unprotected speech, the First Amendment is not implicated.

Here, RCW 9A.76.180(1) provides, "A person is guilty of intimidating a public servant if, by the use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant." Under RCW 9A.76.180(3)(b), "'Threat' as used in this section means . . . [t]hreats

---

[15] Immelt, 173 Wn.2d at 6.

[16] Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 114, 937 P.2d 154 (1997).

[17] State v. Williams, 144 Wn.2d 197, 207, 26 P.3d 890 (2001).

[18] State v. Kilburn, 151 Wn.2d 36, 42-43, 84 P.3d 1215 (2004).

[19] State v. Knowles, 91 Wn. App. 367, 373, 957 P.2d 797 (1998) (alterations in original) (quoting United States v. Khorrami, 895 F.2d 1186, 1192 (7th Cir. 1990)).

as defined in RCW 9A.04.110." RCW 9A.04.110(28) provides several alternative definitions of "threat."

The court instructed the jury solely on the definition of "threat" in RCW 9A.04.110(28)(j). Section (j) defines a "threat" as "a direct or indirect communication with the intent . . . [t]o do any other act which is intended to harm substantially the person threatened or another with respect to his or her health, safety, business, financial condition, or personal relationships." The jury was not instructed as to any of the other definitions of "threat" from RCW 9A.04.110(28).[20]

Although RCW 9A.04.110(28)(j) prohibits true threats because it includes threats to substantially harm a person's health or safety, the statute also implicates protected speech because it includes threats to a person's business, financial condition, or personal relationships. As a result, RCW 9A.04.110(28)(j) prohibits constitutionally protected speech.[21] Because the statute reaches constitutionally protected speech, we "must determine whether it does so in a way that is unconstitutionally overbroad."[22] The answer to this question requires analysis of the appropriate level of scrutiny. There are a variety of approaches to overbreadth

---

[20] The court did not instruct the jury on the other statutory definitions of "threat" in RCW 9A.04.110(28)(a)-(i). Because our analysis under (j) is determinative, we decline to address arguments from Dawley and amicus based on the other definitions of "threat."

[21] See Resp't's Br. at 21 ("The State concedes RCW 9A.04.110(28)(j) does proscribe some protected speech because it does not proscribe only true threats.").

[22] Williams, 144 Wn.2d at 209.

analysis,[23] but it is clear there are certain critical considerations, many of which are not in dispute here.

The level of scrutiny we apply depends on the nature of the speech and the nature of the restriction. It may also depend on whether the statute restricts conduct or pure speech. In its brief, the State argues, "The crime of intimidating a public servant is not a crime of pure speech" because it "includes not only a threat, but importantly an intent to influence a public servant."[24] And because intimidating a public servant includes the intent to influence, "[t]his takes the crime out of [the] realm of pure speech."[25] But at oral argument, the State acknowledged the additional intent element is not a form of conduct. We conclude RCW 9A.76.180 regulates pure speech.

_____

[23] See Richard H. Fallon, Making Sense of Overbreadth, 100 YALE L.J. 853 (1991); Luke Meier, A Broad Attack on Overbreadth, 40 VAL. U. L. REV. 113 (2005); Matthew D. Bunker, Clay Calvert, William C. Nevin, Strict in Theory, But Feeble in Fact? First Amendment Strict Scrutiny and the Protection of Speech, 16 COMM. L. & POL'Y 349 (2011). State v. Homan, 191 Wn. App. 759, 767-70, 364 P.3d 839 (2015), offers a thoughtful framework for overbreadth analysis: "We engage in a four-part analysis to determine whether a law is facially overbroad under the First Amendment. First, we must determine whether the challenged law actually prohibits speech. . . . Second, we must determine the legitimate sweep of the challenged law—whether the law legitimately prohibits certain speech. . . . Third, we must determine whether the challenged law also prohibits constitutionally protected speech. . . . Fourth, we must determine whether the challenged law prohibits a substantial amount of such speech." (Citations omitted.)

[24] Resp't's Br. at 27.

[25] Id.

When, as here, a statute regulates pure speech, the statute "'must be interpreted with the commands of the First Amendment clearly in mind.'"[26] A statute regulating pure speech is unconstitutionally overbroad if it restricts a substantial amount of protected speech.[27]

The level of scrutiny may also depend on whether a restriction is content-based or content-neutral. Here, the State does not dispute that RCW 9A.76.180 is a content-based restriction. We agree because the statute specifically criminalizes speech intended to influence a public servant. "'Content-based restrictions on speech are presumptively unconstitutional and are thus subject to strict scrutiny.'"[28] We conclude RCW 9A.76.180 is subject to strict scrutiny.

"[S]trict scrutiny requires a statute be narrowly tailored to serve a compelling state interest."[29] Thus, to overcome Dawley's overbreadth challenge, the State must establish the intimidating a public servant statute is necessary to serve a compelling state interest and the statute is narrowly tailored to achieve that purpose.

As to the state interest served, the intimidating a public servant statute "protects public servants from threats of substantial harm" and it "protects the

---

[26] Williams, 144 Wn.2d at 206-07 (quoting Watts v. United States, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969)).

[27] City of Seattle v. Huff, 111 Wn.2d 923, 925, 767 P.2d 572 (1989).

[28] Williams, 144 Wn.2d at 208 (quoting Collier v. City of Tacoma, 121 Wn.2d 737, 748-49, 854 P.2d 1046 (1993)).

[29] Id. at 211.

public's interest in a fair and independent decision-making process."[30] Additionally, RCW 9A.76.180 deters "the intimidation and threats that lead to corrupt decision making, it helps maintain public confidence in democratic institutions."[31] These government interests are compelling. The harder question is whether the statute is narrowly tailored to achieve these interests.

The only Washington case directly addressing the constitutionality of RCW 9A.76.180 is State v. Stephenson.[32] In Stephenson, as in this case, the definition of "threat" in RCW 9A.04.110(28)(j), then codified as .110(25)(j), was the only definition at issue. The Stephenson court first concluded, "RCW 9A.04.110(25)(j)'s prohibitions encompass a 'real and substantial' amount of protected speech."[33] We agree.

In addition to true threats, the statutory definition of "threat" in RCW 9A.04.110(28)(j) sweeps up a substantial amount of protected speech, including criticism, commentary, and even political hyperbole[34] towards and about

---

[30] State v. Stephenson, 89 Wn. App. 794, 803-04, 950 P.2d 38 (1998).

[31] Id. at 804.

[32] 89 Wn. App. 794, 950 P.2d 38 (1998).

[33] Id. at 802.

[34] A broad range of political hyperbole can be protected speech. See State v. Strong, 167 Wn. App. 206, 216 n.1, 272 P.3d 281 (2012) (discussing Watts v. United States, 394 U.S. 705, 706, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (United States Supreme Court reversal of conviction for threatening President Lyndon B. Johnson. Watts stated, "If they ever make me carry a rifle[,] the first man I want to get in my sights is L.B.J." The Court concluded that because the challenged statute regulated pure speech, it must distinguish political hyperbole and true threats.)).

public servants.[35] Such political speech is at the core of First Amendment protection "no matter how vehement, caustic and sometimes unpleasantly sharp."[36]

In Stephenson, the court determined, "The public's interest in open and fair government decision making provides a . . . compelling justification for an incidental limitation of protected speech."[37] The court concluded the limitation was incidental because the challenge involved only one subsection of the threat definition, any threat "must be substantial, not threats that merely embarrass or inconvenience their target," and the intimidation statute required a specific state of

---

[35] Dawley offers several examples of protected speech swept up by subsection (j). See Appellant's Br. at 28 ("The 'threats' included in RCW 9A.04.110(28)[(j)] include . . . an attorney who threatens to run for office against a mayor if she persists with homeless encampment sweeps . . . . [o]r, a bar investigator who threatens to bring a disciplinary action against an attorney general if she does not cease revealing privileged client communications."). Amicus also offers several examples. See Amicus Br. at 6 ("For example, RCW 9A.04.110(28)(d) or (j) is broad enough to cover threatening to sue or bring charges against an officer if they do not cease an arrest where the arrestee believes the officer is violating their civil rights.").

[36] The United States Supreme Court has recognized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

[37] Stephenson, 89 Wn. App. at 806.

mind.[38] "[A] critical element of the statute here is the requirement that the defendant 'attempt to influence' the targeted public servant's behavior."[39]

Although the <u>Stephenson</u> court initially identified the incorrect level of scrutiny,[40] the court's final conclusion touched on the appropriate level of strict

---

[38] <u>Id.</u> at 807.

[39] <u>Id.</u>

[40] In considering whether the prohibition was constitutionally permissible, the <u>Stephenson</u> court incorrectly engaged in forum analysis, utilizing the nonpublic government forum level of scrutiny rather than the heightened level of scrutiny applicable to private communications not occurring on any form of government property. "Generally, when a free speech challenge arises <u>in regard to activity on property owned and controlled by the government</u>, a court will engage in a 'forum analysis' to determine the level of judicial scrutiny that applies." <u>Bradburn v. North Cent. Reg'l Library Dist.</u>, 168 Wn.2d 789, 813, 231 P.3d 166 (2010) (emphasis added). Forum analysis looks at whether the speech occurs in a government-owned public forum, limited-public forum, or a nonpublic forum. <u>Sprague v. Spokane Valley Fire Dep't</u>, 189 Wn.2d 858, 878-79, 409 P.3d 160 (2018). "The governmental regulation of speech in a nonpublic forum does not violate the First Amendment if 'the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint-neutral'" <u>Stephenson</u>, 89 Wn. App. at 803 (quoting <u>City of Seattle v. Eze</u>, 111 Wn.2d 22, 32, 759 P.2d 366 (1988)). On the other hand, the appropriate level of scrutiny for speech on private property is whether the regulation was narrowly tailored to serve a compelling government interest.

In <u>Huff</u>, 186 Wn.2d 210, 375 P.3d 1056 (2016), our Supreme Court applied forum analysis to an overbreadth challenge to a Seattle telephone harassment ordinance. The court ultimately applied the nonpublic forum standard of scrutiny to telephone communication. A law restricting communication in a nonpublic forum is subject to the lowest level of scrutiny, whereas a law restricting communication in a public forum is subject to heightened scrutiny because the "principal purpose of traditional public forum is the free exchange of ideas." <u>Cornelius v. NAACP Legal Def. and Educ. Fund</u>, 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). <u>Huff</u> has been criticized for "applying the nonpublic forum doctrine to devalue speech occurring on private property." Aaron H. Caplan, <u>Stretching the Equal Access Beyond Equal Access</u>, 27 SEATTLE U.L. REV. 273, 362 (2003); <u>see also</u> Aaron H. Caplan, <u>Invasion of the Public Forum Doctrine</u>, 46 WILLAMETTE L. REV. 647, 658 (2010). We conclude forum analysis is not

scrutiny for speech occurring on private property. "Considering the State's compelling interest in maintaining the integrity of government action and the narrow tailoring of the statute, we conclude that the challenged statute is reasonable in light of its purposes and is not unconstitutionally overbroad."[41]

We disagree with the Stephenson court's conclusions that the intimidating a public servant statute involves only incidental restrictions and that the statute is narrowly tailored. As discussed above, the statutory definition of "threat" in section RCW 9A.04.110(28)(j) goes beyond true threats and sweeps up a substantial amount of protected speech, including political speech at the core of First Amendment protection. The statute impacts a substantial amount of protected speech and is not narrowly tailored. Thus, the intimidating a public servant statute, when based on RCW 9A.04.110(28)(j), is unconstitutionally overbroad.

However, "'[a] statute or ordinance will be overturned only if the court is unable to place a sufficiently limiting construction on a standardless sweep of

---

applicable to this case. Despite any confusion in Huff and Stephenson, it is clear that forum analysis applies only to speech occurring on government property.

[41] Stephenson, 89 Wn. App. at 807. In State v. Montano, our Supreme Court addressed the question "whether sufficient evidence existed that Montano intended his threats [to a public servant] to influence an official action." 169 Wn.2d 872, 876, 239 P.3d 360 (2010). Our Supreme Court cited Stephenson and approved the observation that "'the attempt to influence' element of the crime cannot be satisfied by threats alone. . . . [T]o convict a person of intimidating a public servant, there must be some evidence suggesting an attempt to influence, aside from the threats themselves or the defendant's generalized anger at the circumstances." Id. at 877. Despite our Supreme Court's general approval of the logic of Stephenson, in Montano, the court did not address whether the intimidating a public servant statute was unconstitutionally overbroad.

legislation.'"[42] Dawley argues that only a true threats limitation can save this statute when the jury is instructed on a threat solely under RCW 9A.04.110(28)(j). We agree. By limiting the statute to true threats, no protected speech is implicated.

We are not persuaded to adopt a more relaxed limitation, such as the "inherently wrongful" limitation from State v. Pauling.[43] In Pauling, our Supreme Court considered an overbreadth challenge to former RCW 9A.56.130 (1975), the second degree extortion statute. That statute provided, "A person is guilty of extortion in the second degree if he commits extortion by means of a threat as defined in then RCW 9A.04.110(25)(d) through (j)." The court concluded the statute prohibited "a real and substantial amount of protected speech that the government may not infringe upon."[44]

But our Supreme Court determined it was "unnecessary to strike [the extortion statute] because we may impose a limiting construction in the form of a requirement that there be a 'lack of nexus' that limits its application to only unprotected speech."[45] According to Pauling, in the context of extortion, a threat is "inherently wrongful" if there is no nexus between the threat itself and the property the threat attempts to gain.

---

[42] Immelt, 173 Wn.2d at 6-7 (quoting City of Tacoma v. Luvene, 118 Wn.2d 826, 840, 827 P.2d 1374 (1992)).

[43] 149 Wn.2d 381, 391, 69 P.3d 331 (2003).

[44] Id. at 389.

[45] Id. at 391 (emphasis added).

15

The "inherently wrongful" threat limitation utilized in Pauling is not appropriate in this case because the crime of extortion is fundamentally different from the crime of intimidating a public servant. Extortion is an extension of theft.[46] Unlike intimidating a public servant, extortion is a mixed conduct and speech crime.[47] When a statute regulates mixed conduct and speech, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."[48]

And in the case of pure speech regulation, the statute is unconstitutionally overbroad if it prohibits a substantial amount of protected speech. Even if the government has a compelling interest, the statute must be narrowly tailored to achieve that purpose.[49] Unlike Pauling and the second degree extortion statute, an "inherently wrongful" limitation would not limit RCW 9A.76.180 to "only unprotected speech."[50] No matter the motive behind an individual's attempt to influence a public servant's vote, opinion, decision, or other official action as a public servant, such pure political speech is at the core of the First Amendment and necessarily subject to heightened protection. The "inherently wrongful"

---

[46] See Strong, 167 Wn. App. at 214 ("[E]xtortion requires the unlawful compelling of the victim to give up property; it is an extension of theft.").

[47] Id. ("The central importance to the crime of nonspeech conduct—the wrongful acquisition or attempted acquisition of another's property—takes extortion outside the category of pure speech.").

[48] Id. at 215.

[49] Huff, 111 Wn.2d at 925.

[50] Pauling, 149 Wn.2d at 391.

limitation is inapplicable to pure political speech. We agree with Dawley. The only constitutionally permissible limiting construction to save the intimidating a public servant statute when the jury is instructed on the definition of "threat" from RCW 9A.04.110 (28)(j) is to limit the statute to true threats alone.

The State concedes, and we agree, Dawley did not issue a true threat against either Chief Dresker or Esparza. He made no serious expression of intention to inflict bodily harm upon or to take the life of another individual. Because there is insufficient evidence to support Dawley's convictions for intimidation of a public servant, we do not address Dawley's alternative arguments.

We reverse Dawley's convictions for intimidation of a public servant and remand for proceedings consistent with this opinion.

WE CONCUR:

_____

_____                    _____
Chun, J.                                      Andrus, J.