IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE CITY OF SEATTLE, | No. 81627-6-I |
| Respondent, | |
| v. | DIVISION ONE |
| ARTEMAS D. BUFORD-JOHNSON, | PUBLISHED OPINION |
| Petitioner. | |

SMITH, J. — Freedom of speech is "the matrix, the indispensable condition, of nearly every other form of freedom." Palko v. Connecticut, 302 U.S. 319, 327, 58 S. Ct. 149, 82 L. Ed. 288 (1937) (overruled on other grounds by Benton v. Maryland, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)).

Almost ten years ago, Artemas Buford Johnson[1] was arrested after he drove past a Seattle Police Department officer and yelled "fuck the police" while pointing as if he had a gun. The City of Seattle charged Johnson with harassment and Johnson stipulated to the facts in the police officer's report. The municipal court found Johnson guilty, and on appeal, the superior court affirmed.

---

[1] While the caption in this case refers to "Buford-Johnson" in conformity with the complaint filed by the City, it appears that the petitioner's name is Artemas Buford Johnson, without a hyphen, and we refer to him as Johnson throughout the opinion.

Citations and pin cites are based on the Westlaw online version of the cited material.

Johnson petitioned for discretionary review in this court, contending that he did not make a true threat and that therefore, the First Amendment to the United States Constitution barred his conviction. We granted discretionary review and now conclude that Johnson's expressive conduct was protected by the First Amendment. Accordingly, we reverse.

FACTS

Around 9:45 PM on May 26, 2012, Seattle Police Officer Eric Zerr responded to a 911 call reporting a fight on Rainier Avenue South.[2] When Officer Zerr got near the location, he exited his vehicle and walked north on the street. He noticed a gold Ford Explorer with its headlights off driving north on the other side of the street. The Ford slowed as it approached him, and the "driver yelled 'fuck the police' as he looked at [Officer Zerr] and held his left hand next to the driver's door with an object or his finger pointed at [Officer Zerr] as if it was a firearm." Afraid that the driver might be pointing a firearm at him, Officer Zerr "quickly moved into the shadows and behind a telephone pole." The car then "sped off northbound" but shortly thereafter stopped at a red light. At Officer Zerr's request, approaching police officers stopped the car. Officer Zerr kept the car in his sight and saw that the driver kept his arm out of the car window until he was stopped. The officers searched the car and its occupants and arrested the driver, Johnson. The police report indicates that no firearms were found. At the precinct, Johnson stated that someone else in the car had yelled at the officer.

---

[2] The first paragraph of this statement of facts is taken from the police report.

On May 27, 2012, the City of Seattle charged Johnson with one count of harassment. In February 2013, the City and Johnson entered an agreed order to continue the case. Under the agreed continuance, if Johnson complied with certain conditions for two years, the City would dismiss the charge. If Johnson failed to comply with the conditions, however, the court would determine his guilt based solely on the facts in the police report, which Johnson stipulated to.

Johnson later admitted that he had violated the terms of the agreed continuance. The Seattle Municipal Court reviewed the police report and found Johnson guilty of harassment on December 8, 2017. Johnson appealed to the King County Superior Court, and in January 2019, the court remanded for the municipal court to enter findings of fact and conclusions of law explaining its verdict.

On June 13, 2019, the municipal court again found Johnson to be guilty of harassment on the grounds that Johnson threatened to cause bodily injury or to substantially harm Officer Zerr and that Officer Zerr had reasonable fear that he was about to be shot. Johnson appealed to superior court again, and the superior court affirmed. Johnson then petitioned for discretionary review in this court, and we granted review.

ANALYSIS

Johnson contends that the court erred by affirming his conviction because the evidence does not establish that he made a true threat against Officer Zerr, that he knowingly communicated a threat, or that Officer Zerr was in objectively reasonable fear of bodily harm. While the evidence does establish that Officer

Zerr was reasonably afraid, we agree with Johnson that the evidence does not establish that Johnson made a true threat or that he knowingly did so.

Standard of Review

We review a trial court's conclusions of law de novo. State v. Frahm, 193 Wn.2d 590, 595, 444 P.3d 595 (2019). "When reviewing a challenge to the sufficiency of evidence, we view the evidence in the light most favorable to the State and determine whether 'any rational trier of fact could have found guilt beyond a reasonable doubt.'" Frahm, 193 Wn.2d at 595 (quoting State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

However, the First Amendment right to free speech requires appellate courts to "be exceedingly cautious when assessing whether a statement falls within the ambit of a true threat" to avoid infringing on the right to free speech. State v. Kilburn, 151 Wn.2d 36, 49, 84 P.3d 1215 (2004). Accordingly, we must conduct "'an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure the protected expression will not be inhibited.'" Kilburn, 151 Wn.2d at 50 (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 505, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984)). While we continue to defer to trial court findings on witness credibility and issues other than whether speech is constitutionally protected, we must independently review those "'crucial' facts

that necessarily involve the legal determination whether the speech is unprotected." Kilburn, 151 Wn.2d at 50, 52.

Evidence of Harassment

Former Seattle Municipal Code (SMC) 12A.06.040(A)(2) (2012)[3] provides that a person is guilty of harassment if they knowingly threaten:

> a. To cause bodily injury immediately or in the future to the person threatened or to any other person, or
> . . . .
> d. Maliciously to do any other act which is intended to substantially harm the person threatened or another with respect to his or her physical or mental health or safety, and
> e. The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out.

We first note that sufficient evidence supports the court's conclusion that Johnson's conduct placed Officer Zerr in objectively reasonable fear of bodily harm as required by former SMC 12A.06.040(A)(2)(e). Because this is a statutory question and does not "necessarily involve the legal determination whether the speech is [constitutionally] unprotected," we view the facts in the light most favorable to the City rather than undertaking an independent review. Kilburn, 151 Wn.2d at 52. The record establishes that Officer Zerr was out at 9:45 PM by himself, a car without headlights drove by, the driver yelled at him, and Officer Zerr thought he had seen an object that might be a firearm. Officer Zerr then "quickly moved into the shadows and behind a telephone pole, fearing the pointed object might be a firearm." Considering these circumstances, a

---

[3] Available at http://clerk.seattle.gov/~F_archives/HistoricSMC/.

reasonable fact finder could conclude that Johnson's conduct placed Officer Zerr in reasonable fear of bodily harm.

Next, we determine whether Johnson threatened Officer Zerr. A law such as this ordinance that "criminalizes pure speech . . . must be interpreted with the commands of the First Amendment clearly in mind." Kilburn, 151 Wn.2d at 41 (internal quotation marks omitted) (quoting State v. Williams, 144 Wn.2d 197, 206-07, 26 P.3d 890 (2001)). "The First Amendment generally prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas expressed." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992).

To comply with these constitutional guarantees, the harassment ordinance "must be read as clearly prohibiting only 'true threats,'" which are not protected speech under the First Amendment because of the overriding state interest in protecting individuals from the fear of violence, preventing the disruption that this fear causes, and preventing the possible threatened violence from occurring. Kilburn, 151 Wn.2d at 43 (analyzing identical language in RCW 9A.46.020) (quoting Williams, 144 Wn.2d at 208). We use an objective test to identify whether speech is a true threat: "'[a] true threat is a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm.'" Williams, 144 Wn.2d at 207-08 (second alteration in original) (internal quotation marks omitted) (quoting State v. Knowles, 91 Wn. App. 367, 373, 957 P.2d 797 (1998)). "A true threat is a serious threat, not one said in jest,

6

idle talk, or political argument." Kilburn, 151 Wn.2d at 43. "[T]he nature of a threat depends on all the facts and circumstances, and it is not proper to limit the inquiry to a literal translation of the words spoken." State v. C.G., 150 Wn.2d 604, 611, 80 P.3d 594 (2003). "[I]t is not just the words and phrasing of the alleged threat that matter, but also the larger context in which the words were uttered, including the identity of the speaker, the composition of the audience, the medium used to communicate the alleged threat, and the greater environment in which the alleged threat was made." State v. Kohonen, 192 Wn. App. 567, 580, 370 P.3d 16 (2016).

A discussion of Washington precedent is instructive. In Kilburn, our Supreme Court reversed Martin Kilburn's harassment conviction after concluding that he had not made a true threat. 151 Wn.2d at 54. In that case, Kilburn, an eighth grade student, was chatting and laughing with a classmate at the end of the school day and looked at a book with military men and guns on it. Kilburn, 151 Wn.2d at 52. Half smiling, Kilburn turned to the classmate and said that he was "going to bring a gun the next day and shoot everyone, beginning with her. Then he began giggling, and said maybe not her first." 151 Wn.2d at 52. The classmate testified that Kilburn sometimes made jokes, that they had never had a fight or disagreement, and that she later wondered whether he was joking. Kilburn, 151 Wn.2d at 52-53. The Supreme Court determined that despite the classmate's further testimony about being freaked out and later deciding that he must have been serious, because "a reasonable person in Kilburn's position

would foresee that his comments would not be interpreted seriously," the comment was not a true threat. Kilburn, 151 Wn.2d at 52-53.

In State v. Locke, 175 Wn. App. 779, 307 P.3d 771 (2013), the court affirmed Robert Locke's conviction for threatening former Governor Christine Gregoire. Locke had sent two e-mails to Governor Gregoire through a form on her website: the first said he hoped one of her family members would be "raped and murdered by a sexual predator," and the second said that she "should be burned at the stake like any heretic." Locke, 175 Wn. App. at 785. Both times, Locke entered "Gregoiremustdie" into the field for his city. Locke, 175 Wn. App. at 785. Locke then used a form on the Governor's website to invite Governor Gregoire to an "event," the subject of which was "Gregoire's public execution" and at which she would be the "Honoree." Locke, 175 Wn. App. at 786. He listed his organization as "Gregoire Must D[i]e" and indicated that the event would be held at the Governor's Mansion, would last 15 minutes, would have an audience of more than 150, and that the media would be invited. Locke, 175 Wn. App. at 786.

The court concluded that neither of the first e-mails were unprotected speech, noting that although the speech was violent and upsetting, its passive phrasing "blunt[ed] the implication that Locke [was] threatening to do this himself." Locke, 175 Wn. App. at 791-92. However, in analyzing the event invitation, the court concluded that the "increasingly specific and detailed" nature of the communications threw "the threat into higher relief and translate[d] it from the realm of the abstract to that of the practical." Locke, 175 Wn. App. at 793,

795.  The court also noted that United States House Representative Gabrielle Giffords had been shot by a gunman 17 days earlier and that the rapid progression of Locke's communications would lead the governor to take the invitation seriously.  Locke, 175 Wn. App. at 792.  Finally, unlike in Kilburn, "Locke had no preexisting relationship or communications with the governor from which he might have an expectation that she would not take his statements seriously."  Locke, 175 Wn. App. at 793.  Based on all the contextual information, the court concluded that Locke's invitation was a true threat.  Locke, 175 Wn. App. at 793-96.

Here, we conclude that the evidence does not establish that Johnson made a true threat.  Whether Johnson's speech was a true threat directly determines whether his speech was unprotected, so we engage in an independent review of the crucial facts.  We start by looking to the words Johnson spoke: Johnson's statement did not itself express any intention to cause harm, but instead was a generalized and political statement of animosity.[4]  We have noted that "criticism, commentary, and even political hyperbole towards and about public servants" is political speech that "is at the core of First Amendment protection 'no matter how vehement, caustic[,] and sometimes unpleasantly

---

[4] The City disagrees that Johnson's statement was political speech.  While pointing at Officer Zerr as if he had a gun may not have been political, Johnson's speech itself clearly "relat[ed] to government, a government, or the conduct of government affairs" and expressed a pointed opinion to that effect. *Political*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1755 (2002).  Johnson also notes that "fuck the police" may be a reference to "Fuck tha Police," a "well-known police protest song."  State v. Boettger, 310 Kan. 800, 821, 450 P.3d 805 (2019), cert. denied, 140 S. Ct. 1956 (2020); N.W.A., *Fuck tha Police*, *on* STRAIGHT OUTTA COMPTON (Ruthless /Priority Records 1988).

sharp.'" State v. Dawley, 11 Wn. App. 2d 527, 539, 455 P.3d 205 (2019) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)). The trial court therefore appropriately concluded that Johnson's language itself was protected speech. However, Johnson also pointed at Officer Zerr as if he had a firearm,[5] expressive conduct that does imply violence. The City correctly notes that mimicking the firing of a gun has been considered threatening in other contexts and jurisdictions. See, e.g., Haney v. U.S., 41 A.3d 1227, 1234 (2012) (defendant miming shooting a gun at a witness and mouthing "I'm going to fuck you up" could reasonably be considered a threat). We must therefore examine "all the facts and circumstances" to determine whether Johnson's conduct constituted a threat in this case. C.G., 150 Wn.2d at 611.

The circumstances here do not convince us that Johnson's speech and conduct together constituted a true threat. Johnson did not stop or approach Officer Zerr, but instead continued driving north throughout the interaction. Furthermore, Johnson kept his arm hanging out of the window of the car as he continued to drive, and then immediately stopped at a red light. These facts are more suggestive of a casual encounter or idle talk than a serious threat.[6]

---

[5] Because Johnson stipulated to the police report, we assume that he did point an object or his hand as if it were a firearm. This is despite the seeming inconsistency that Officer Zerr could not see Johnson's hand well enough to tell whether he was holding an object, but nonetheless could see that it was pointed "as if it was a firearm."

[6] We also note that there is no clarification as to whether Johnson actually mimed shooting a gun or merely pointed his hand in a manner that was evocative of a gun, which would give more information about the extent to which Johnson's conduct clearly expressed violence.

The City disagrees and points out that the reaction of the recipient can be informative in determining whether a statement was a true threat. See Kohonen, 192 Wn. App. at 582 (concluding that tweets did not constitute true threats in part because "not one of the people in J.K.'s intended audience . . . perceived the tweets to be serious threats."). As we have noted, Johnson's statement and conduct placed Officer Zerr in reasonable fear for his safety. However, the fact that Officer Zerr was afraid is not determinative: the true threat inquiry asks whether there is sufficient evidence that a person in *Johnson's* position would "'foresee that [his] statement would be interpreted . . . as a serious expression of intention to inflict bodily harm.'" Williams, 144 Wn.2d at 208 (second alteration in original) (quoting Knowles, 91 Wn. App. at 373). Here, Officer Zerr was afraid because he thought he might have seen a firearm, but Johnson did not have a firearm and there is no suggestion that he should have anticipated that Officer Zerr would think he had one. Therefore, the fact that Officer Zerr was afraid does not indicate that Johnson's conduct rose to the level of a true threat.

The City notes that Officer Zerr and Johnson did not know each other, and that the lack of a preexisting relationship supported the court's determination of a true threat in Locke. However, in that case, Locke clearly knew who the governor was and was making detailed threats against her specifically, and the lack of a preexisting relationship meant that the governor had no reason to assume the threats were frivolous. 175 Wn. App. at 793-94. Here, the interaction was more random: Johnson saw a police officer while he was driving and expressed animosity toward police officers. He did not stop or approach

11

Officer Zerr, and there is no suggestion that he knew or was targeting this specific police officer. The communication here was lacking the specificity or pointedness that was present in Locke and that made the governor take the invitation to her own execution seriously. As Johnson drove away, Officer Zerr had no reason to think that Johnson intended to come back to find or harm him specifically. Thus, although there was no preexisting relationship like the one in Kilburn that would have enabled Officer Zerr to believe the threat was frivolous, there was also a lack of personal connection that would lead Officer Zerr to believe that Johnson was targeting him personally.

The City claims that Johnson driving at night without lights shows that he was attempting to prevent his identification, but there is no evidence that this is the case as opposed to nonfunctioning headlights or forgetfulness. The City also contends that Johnson's "precipitous flight from the scene and his later attempt to shift the blame to one of his passengers shows his awareness of the threatening nature of his conduct." However, given that Johnson was driving throughout the interaction, immediately stopped at a red light, and only blamed one of his passengers after being arrested for what he had said, we are not convinced that these actions show he knew that his conduct was threatening.

The record here does not establish beyond a reasonable doubt that a reasonable person in Johnson's position would "'foresee that [his] statement would be interpreted . . . as a serious expression of intention to inflict bodily harm.'" Williams, 144 Wn.2d at 208 (second alteration in original) (quoting Knowles, 91 Wn. App. at 373). Therefore, the speech does not rise to the level

of a true threat[7] and there is insufficient evidence to support Johnson's conviction.

We reverse.

_____

WE CONCUR:

_____     _____
                              Andrus, A.C.J.

---

[7] We also note that because there is insufficient evidence that Johnson actually made a true threat, there is necessarily insufficient evidence that he "knowingly" did so under former SMC 12A.06.040(A)(2).