THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81001-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FLOYD TAYLER, | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |

ANDRUS, A.C.J. — Floyd Tayler challenges his convictions for the unlawful imprisonment and assault of his girlfriend, R.R. He raises nine challenges to his conviction and sentence, none of which provide a basis for reversal. We affirm.

<u>FACTS</u>

Tayler and R.R., both Canadian citizens, lived together for approximately a year and a half before the incidents leading to Tayler's conviction. In June 2019, Tayler invited his adult sons to spend Father's Day weekend with him and R.R. in Whatcom Meadows, a private park in which Tayler and R.R. owned a timeshare lot and a trailer. On the evening of June 15, Tayler and R.R. argued about Tayler's sons arriving late for dinner. R.R., who had a strained relationship with Tayler's sons, felt that they had acted disrespectfully.

The next morning, Tayler accused R.R. of ruining his Father's Day by making his sons feel unwelcome the night before. Tayler and his sons left the park and spent the day together golfing. That afternoon, after the sons left to return home, Tayler raised again his complaint that R.R. was to blame for making his sons feel unwelcome in the trailer.

On the morning of June 17, Tayler vented to R.R. about how hurt he was by his sons' action. R.R., who felt the sons manipulated Tayler, called the boys "motherf---ers." Tayler became angry at her comment and "just completely . . . lost it." Their argument escalated as the day went on. Tayler repeatedly yelled at R.R., demanding she apologize, but R.R., afraid at what would happen as he escalated, stayed quiet, hoping he would stop.

At some point, R.R. began recording Tayler with her cell phone because she "was afraid of what he was going to do" to her. At trial, R.R. described Tayler's threats and assaultive conduct, which the State corroborated by playing portions of R.R.'s recording. In this recording, Tayler can be heard threatening to "come over there and grab [R.R.] by the throat," and told her she was "not going to win this time [because] you are not worth it." The recording demonstrated that as Tayler's anger increased, he began to throw household items at R.R., continued to verbally berate her, and accused her of being "f---ing twisted." At one point when Tayler was screaming into R.R.'s ear, she covered her eyes with her hands, but Tayler pulled them away and held them down. R.R. begged Tayler to "just leave me [inaudible], don't touch me, I am asking you," to which Tayler responded "Too bad."

When R.R. told Tayler she did not want to be with him anymore, Tayler ordered R.R. to leave the trailer and gave her one hour to gather her belongings. Tayler then began throwing and smashing her belongings. When she picked up a laundry basket to collect her personal possessions, Tayler refused to let her use it because, he said, it belonged to him. When she next tried to put her things in garbage bags, Tayler told her she could not use his bags either and threatened to slam her hands in cupboard doors.

When R.R. actually tried to leave the trailer, Tayler blocked the door and told her she could not leave. Tayler pushed R.R. down into a chair, removed her shoes, positioned a table in R.R.'s path, and sat down on it. The recording captured R.R. shouting in pain, and Tayler mimicking her pleas that he stop. He told R.R. "You see what happens, [R.R.], you see what happens? You are not going to overpower me, you are trying to, sit, sit."

R.R. told Tayler she did not want to be there and wanted to leave. Tayler responded that R.R. was "in no shape to go outside the trailer." The recording captured R.R. repeatedly pleading to leave and telling Tayler she was afraid of him. Begging to get outside, R.R. told Tayler that he could not keep her there; he responded, "yeah[,] I can."

Tayler trapped R.R. inside the trailer for approximately 10 minutes. When she finally got outside, R.R. collapsed in a chair. After calming down, R.R. realized her purse, passport, keys, wallet, and medications remained inside. Tayler initially refused to let her in to collect her things, but eventually relented. R.R. ultimately decided not to leave because Tayler appeared to have calmed down.

Later that evening, after dinner, they sat around a campfire having a cocktail. Tayler told R.R. that after their argument that morning, he had visited a neighbor couple and told them what R.R. had said about his sons. R.R., upset at Tayler involving the neighbors in their dispute, decided to leave. She picked up her purse and sweater and started walking down the road. Tayler tried to stop her, but she told him to leave her alone.

When R.R. reached the end of the gravel road, she heard Tayler running up behind her. He grabbed her, spun her around, and threw her into the ditch. Although R.R. was not intoxicated, Tayler yelled at her to get up, accusing her of being drunk. Tayler grabbed R.R.'s purse, yanking the strap repeatedly even after R.R. told him he was hurting her. After he gained control of her purse, she picked up her sweater and realized it was ripped. Tayler said "Oh, did I rip your sweater? . . . [L]et me do it some more." Because Tayler had her purse, passport, keys and wallet, R.R. realized she could not leave so she returned to the trailer with him.

After this incident, R.R. developed visible bruising on both of her arms where Tayler had grabbed her. She also developed bruising on her arms from the force of Tayler pulling her purse over her head.

Two days later, while packing to leave, R.R. told Tayler that she wanted to take all of her personal belongings home because she would never be comfortable there again. As she packed items, Tayler removed them and even hid some of them. At some point, Tayler either took R.R.'s purse again or refused to let her back into the trailer, so she left and walked to the park's office. Tayler drove their van to the office and insisted she get into the vehicle with him. R.R. refused and

when Tayler got out of the van to talk to her, she grabbed her purse. He yelled profanities at her, got into the van and drove away. A staff member inside the park office, having seen this exchange, invited R.R. inside the office. The office manager called the police.

Whatcom County Sheriff Deputy Mason Stafford responded to the call and interviewed R.R. He described R.R. as agitated, emotional and crying throughout their conversation. Deputy Stafford photographed R.R.'s bruises on her hands and upper arms. Deputy Stafford located Tayler at a friend's trailer in a Ferndale RV Park where he placed Tayler under arrest.

The State charged Tayler with one count of unlawful imprisonment, domestic violence, and assault in the fourth degree, domestic violence. The State also alleged as an aggravating circumstance that the unlawful imprisonment was part of an ongoing pattern of abuse, pursuant to RCW 9.94A.535(3)(h)(i).

At trial, the State introduced evidence of numerous incidents of domestic abuse by Tayler that predated the June 2019 events. R.R. testified that in July 2018, she threw Tayler a birthday, after which Tayler became sullen. During an argument, Tayler flung a tray of glasses, shattering them on the floor. Tayler claimed he bumped into the tray by accident, but R.R. testified his conduct scared her because it was directed at her.

In the fall of 2018, while on vacation in Mexico, during an argument, Tayler threw a glass of water on R.R. before shoving her into a lounge chair. R.R. was so upset that she began packing to leave. Tayler removed her belongings from the suitcase and threw them on the floor. Tayler then alternatively told her to leave

and prevented her from actually doing so. Tayler again testified he simply tripped and spilled his glass of water on R.R. by accident.

In December 2018, during another argument, Tayler got so angry at R.R. that he "stomped down on" a Christmas gift from R.R.'s daughter, took R.R.'s phone from her and threw her glasses. Tayler admitted he stepped on the gift but insisted this too was just an accident.

Next, on New Year's Eve 2018, Tayler and R.R. drove to Whatcom Meadows to celebrate the holiday. When Tayler decided to go to bed early, R.R. became upset about having to celebrate alone. They again argued. As during other arguments, Tayler took R.R.'s phone and keys, while at the same time repeatedly telling her to "get the f--- out." The next day, while R.R. was lying in bed, Tayler demanded that she leave and pulled her off the bed, onto the floor. Tayler admitted they argued but denied any physical altercation occurred.

In March 2019, during a trip to Las Vegas, the couple argued again after R.R. purchased a timeshare and Tayler complained that she had not made him feel included in the purchase. Tayler threatened to pour out the contents of a bottle of liquor they had purchased and, when he did not follow through with the threat, R.R. did it. In response, Tayler held R.R. down, and poured a bottle of beer over her. When R.R. tried to leave the room, Tayler stopped her. Tayler recalled the incident, admitting that he yelled at her for dumping out the bottle of alcohol, but denied pouring beer on her.

Finally, in May 2019, during an argument, R.R. retreated into their study to "try to get away from him because he was yelling." Tayler grabbed her and tried

to force her into the bedroom. R.R. fell down inside the bedroom. Tayler "stomped his foot down beside [her] head." R.R., afraid that he would kill her, wet herself. When she told Tayler that she needed to go to the bathroom to change, Tayler refused to let her go and, instead, removed her wet pants and underwear. Eventually, Tayler allowed R.R. to go to the bathroom. Tayler denied that this incident ever occurred.

The jury convicted Tayler as charged and found that the unlawful imprisonment constituted an aggravated domestic violence offense. The court sentenced Tayler to an exceptional sentence of 12 months and one day for the unlawful imprisonment and a concurrent sentence of 364 days for the assault.

ANALYSIS

1. Washington Privacy Act

Tayler first argues the trial court erred in admitting R.R.'s recording under the Washington Privacy Act, chapter 9.73 RCW. We disagree.

RCW 9.73.030(1)[1] makes it unlawful for any person to intercept or record a private communication without first obtaining the consent of all parties participating in the conversation. While private conversations recorded without the consent of all participating parties are inadmissible under RCW 9.73.050, conversations which "convey threats of extortion, blackmail, bodily harm, or other unlawful requests or demands" may be recorded with the consent of one party to the conversation. RCW 9.73.030(2)(b). Whether a private communication is protected

_____

[1] RCW 9.73.030 was amended in 2021. LAWS OF 2021, ch. 329, § 21. These amendments do not impact the analysis here. Any reference to the statute in this opinion are to the version in effect at the time of the crimes.

by the Privacy Act is a question of law which we review de novo. State v. Gearhard, 13 Wn. App. 2d 554, 561, 465 P.3d 336, review denied, 196 Wn.2d 1015, 473 P.3d 250 (2020) (citing State v. Kipp, 179 Wn.2d 718, 728, 317 P.3d 1029 (2014)).

On June 17, 2019, R.R. recorded her interactions with Tayler for seven hours in two separate recordings. Although she initially recorded Tayler without his consent, after approximately an hour and fifteen minutes, R.R. told Tayler that she was recording him, to which he responded "Good, record away, I don't give a f--k."[2]

Pretrial, the State sought to admit approximately 25 minutes of one of the recordings. The proposed 25-minute segment started at minute 42:00, shortly before Tayler can be heard threatening to grab R.R. by the throat. This threat was followed by several minutes of Tayler's uninterrupted ranting at R.R., sounds of Tayler throwing household items at R.R. and his shouting repeatedly, at the top of his lungs, and his demanding of R.R. "do you want me to yell in your ear again?" It also captured R.R. telling Tayler that he was hurting her, and his denial of doing so, with the demand that she "[p]rove it, prove it." There are then sounds of a physical assault during which R.R. can be heard begging Tayler not to touch her and shouting in pain. The recording also captured Tayler mocking R.R.'s crying and when R.R. told Tayler not to touch her, Tayler responding, "I will touch you all I want." The next few minutes of the recording include more of Tayler's ranting,

---

[2] The transcripts of the recordings do not reflect any time stamps of what was said when. The durational information here is based on the court's independent review of Exhibit 8, the full audio marked for identification by the State and admitted at trial without objection from Tayler.

expletives, and sounds of a physical assault. Tayler can be heard telling R.R. she had to leave and demanding that R.R. get up to collect her things, followed by sounds of Tayler ranting, throwing and smashing things, and slamming cupboard doors.

Approximately an hour and five minutes into the recording, Tayler tells R.R. to sit, informing her that she won't be able to overpower him, and continuing to mock her as she cried. The recording picked up R.R. telling Tayler that she did not want to be there, that she wanted to leave, that she was afraid of him, and that she did not want him to touch her. R.R. repeatedly begged Tayler to let her out. The State's proposed portion of the recording ended approximately one hour and nine minutes into the recording, when Tayler allowed R.R. to leave the trailer.

Tayler objected to the admissibility of the recording but argued that, if the court admitted the 25-minute excerpt proposed by the State, "we would insist the entire tape be admitted" under ER 106's rule of completeness.

The trial court found that the recording "captures several incidents of physical assaults and threats of bodily injury by the defendant against [R.R.]," noting specifically Tayler's threat "at minute 42:30" where Tayler can be heard saying he could grab her by the throat and other threats of assault occurring "at minute 53." The trial court concluded that "the portions of the recording that contain such threats, including necessary context" are admissible at trial. The court further ruled that, because a portion of the recording was admissible, the entire recording was admissible under ER 106, per Tayler's request.

- 9 -

At trial, the State played a portion of the recording for the jury and, rather than start at minute 42:30, it started the recording several minutes earlier, at minute 30:44, based on the trial court's ruling that the entire recording would be admitted. In these 12 minutes, the couple can be heard arguing but, as the State concedes, Tayler made no explicit threats to R.R.

Tayler first argues that, because R.R. started recording before Tayler made any threats, the entire recording is inadmissible under the Privacy Act. A similar argument was rejected by our Supreme Court in State v. Williams, 94 Wn.2d 531, 617 P.2d 1012 (1980). That case involved a federal investigation into racketeering activities in Pierce County, during which agents surreptitiously recorded several conversations, as allowed by the federal wiretap statute. Id. at 535. When the State charged the defendants with conspiracy to commit murder and arson, it sought to introduce some of the federal agents' recordings. The trial court suppressed the recordings and related testimony, except for the parts of the conversations that conveyed threats of extortion, blackmail, or bodily harm under RCW 9.73.030. Id. at 546.

On appeal, Williams argued that the threat exception applies only to emergency situations and cannot apply to planned police interceptions of conversations. Id. at 547. The court rejected the argument and concluded that neither the language nor the history of RCW 9.73.030(2) supported an interpretation limiting the exception to emergency situations. Id. at 548. "The language of the provision applies equally to emergency and nonemergency situations and the rules of statutory construction do not suggest a contrary

interpretation." Id. at 549. It affirmed the trial court's ruling that even though the recordings captured more conversation than fit within the threat exception, the parts of the recordings relating to those threats were admissible.

As in Williams, R.R. started recording before Tayler made any threats. But also as in Williams, R.R. did not have to wait for an emergency to arise before she could legally start recording. Any portion of an otherwise inadmissible recording is admissible if the communication falls within the ambit of RCW 9.73.030(2)(b).

Tayler next argues that if any portion of the recording is admissible, the court erred in permitting the State to introduce portions that preceded and followed the explicit threats. There are several flaws in this argument.

First, the State had pared down the portions of the recording it initially offered to include only Tayler's explicit threat to strangle R.R., sounds of him assaulting R.R., and his statements refusing to allow her to leave the trailer. The State offered a lengthier portion of the recording only after Tayler asked to have the entire recording admitted. Tayler cannot now complain that the court admitted portions of the recording that he asked to have admitted. The invited error doctrine prohibits the defendant from setting up an error at trial and then complaining of it on appeal. In re Pers. Restraint of Thompson, 141 Wn.2d 712, 723, 10 P.3d 380 (2000). To the extent there was error in admitting portions of the recording that preceded and followed any explicit threats, Tayler invited this error.

Second, the threat exception does not cover only explicit threats but extends to statements that convey implicit threats by suggestion, implication, gestures and behavior. State v. Caliguri, 99 Wn.2d 501, 507-08, 664 P.2d 466

(1983). State v. Babcock, 168 Wn. App. 598, 608, 279 P.3d 890 (2012) is instructive in this regard. In that case, while in prison for child molestation, Babcock enlisted an undercover police officer to kill the father of one of the children he had raped. Id. at 601. Conversations between Babcock and the undercover officer were recorded and Babcock sought to exclude these recordings at his trial. Relying on the dictionary definition of the verb "to convey," we concluded that the phrase "convey a threat," as used in RCW 9.73.030(2)(b) should be broadly interpreted to include any statement made "'to impart or communicate either directly by clear statement or indirectly by suggestion, implication, gesture, attitude, behavior, or appearance'" Id. at 608 (citing Webster's New International Dictionary 499 (3d ed. 1966) (emphasis added).[3] We concluded that statements Babcock made to the undercover officer suggesting they had reached an agreement on a plan to murder the child's father fell within the broad definition of conveying a threat, even though some of Babcock's statements did not include explicit threats. Id. at 609.

In this case, Tayler concedes the recording captures him explicitly threatening R.R. Tayler told R.R. that he could "come over there and grab [her] by the throat," that he "will touch [her] all [he] want[s]," and that he could make her stay in the trailer against her will. These statements were admissible as explicit threats of bodily harm.

But the recording also captured Tayler making statements that indirectly threatened R.R. with physical harm. Tayler's rage toward and domineering control

---

[3] This is supported by Washington's criminal code definition of "threat" as "to communicate, directly or indirectly the intent" to take a certain action. RCW 9A.04.110(28) (emphasis added)

over R.R., combined with his profanity, ridicule and derision, put the explicit threats into context. For example, throughout the recording Tayler mimicked R.R.'s screams of pain and mocked her when she cried. He screamed into R.R.'s ear, and then asked if she wanted him to do it again. When R.R. attempted to find a garbage bag for her belongings, Tayler angrily said "Watch your hand[,] don't get it slammed in the door there. Now be careful because these doors close sometimes unexpectedly" after which the recording picked up the sound of Tayler slamming cupboard doors. Tayler's statements, when considered in light of his conduct, indirectly suggested or implied threats to R.R.'s physical safety.

Finally, the recording is peppered with non-conversational sounds of physical assaults, screaming, and general violence, all falling outside the scope of the Privacy Act. See State v. Smith, 189 Wn.2d 655, 664, 405 P.3d 997 (2017) (screams, shouting, and sounds of a violent assault do not constitute a "conversation" under the Privacy Act). These sounds are not inadmissible.

The trial court properly admitted the recording because it contained implicit and explicit threats of bodily harm, Tayler consented to the recording at a certain point, and Tayler invited any error in requesting that additional, non-threatening, portions of the conversation be admitted.

2. ER 404(b)

Tayler next argues that the trial court erred in admitting ER 404(b) evidence of prior arguments or physical altercations between Tayler and R.R. to show her state of mind during the unlawful imprisonment. We reject this argument.

Under ER 404, evidence of prior misconduct is not admissible when it is offered "for the purpose of proving a person's character and showing that the person acted in conformity with that character." The same evidence, however, may be admitted for proper purposes that include "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b); State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

Before admitting evidence pursuant to ER 404(b), the trial court must

(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

Gresham, 173 Wn.2d at 421 (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). "This analysis must be conducted on the record, and if the evidence is admitted, a limiting instruction is required." State v. Arredondo, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

When the admissibility of evidence is challenged under ER 404(b), we review a trial court's ruling for abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). A trial court abuses its discretion if the decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

Prior acts of violence are admissible under ER 404(b) when they are relevant to prove an element of the crime. State v. Ashley, 186 Wn.2d 32, 41, 375 P.3d 673 (2016); see also State v. Barragan, 102 Wn. App. 754, 759, 9 P.3d 942 (2000). Here, to prove unlawful imprisonment, the State had to establish that

Tayler restrained R.R. RCW 9A.40.040(1). "'Restrain' means to restrict a person's movements without consent and . . . in a manner which interferes substantially with his or her liberty. Restraint is 'without consent' if it is accomplished by (a) physical force, intimidation, or deception . . . ." RCW 9A.40.010(6). Evidence of prior instances of domestic violence may be relevant to establish a lack of consent. Ashley, 186 Wn.2d at 41-42.

Here, the State introduced ER 404(b) evidence regarding prior acts of domestic abuse between Tayler and R.R. to establish that Tayler restrained her without her consent through intimidation and to prove the existence of an ongoing pattern of psychological or physical abuse. The trial court ruled that this evidence was admissible for these two purposes. The trial court provided a limiting instruction, informing the jury that it could consider only these prior incidents to determine R.R.'s state of mind during the alleged unlawful imprisonment and, if the jury found Tayler guilty of that crime, to determine whether the crime constituted an aggravated domestic violence offense. The trial court did not abuse its discretion in analyzing the admissibility of the ER 404(b) evidence or in providing the appropriate limiting instruct to the jury.

State v. Ashley is dispositive here. In that case, Ashley and his girlfriend dated for several years and had children together before separating. 186 Wn.2d at 35. Years later, when the girlfriend and children were visiting Ashley at his sister's home, police knocked at the door seeking to arrest him on an outstanding warrant for a robbery. Id. at 36. To avoid being arrested, Ashley detained the girlfriend and the children in a bathroom, only releasing them when police officers

- 15 -

entered his sister's home.  Id.  The State charged Ashley with unlawful imprisonment for detaining the woman in the bathroom without her consent.  At trial, the court admitted evidence of Ashley's prior domestic violence against his girlfriend to prove he had restrained her through intimidation, despite the lack of any express threat.  Id.

On appeal, Ashley challenged the admissibility of this ER 404(b) evidence.  Id. at 40.  Our Supreme Court concluded that the domestic violence evidence was both material and relevant to decide whether Ashley acted without the woman's consent and restrained her through intimidation.  Id. at 42.  The court acknowledged that the risk of unfair prejudice is very high in cases involving prior acts of domestic violence, but concluded that this type of evidence was "highly probative in assessing whether Ashley intimidated [his girlfriend,] such that she was restrained without her consent."  Id. at 43.

The court distinguished State v. Gunderson, 181 Wn.2d 916, 337 P.3d 1090 (2014), a case on which Tayler relies.  In Gunderson, the defendant had an altercation with his ex-girlfriend, who had a no-contact order against him, and her mother.  Id. at 919.  Gunderson was charged with a felony violation of a court order.  Id.  The mother reported that Gunderson had hit her and his ex-girlfriend.  Id. at 919-20.  His ex-girlfriend, however, testified that the altercation did not involve any physical violence.  Id. at 920.  At trial, the State sought to challenge the ex-girlfriend's credibility by admitting evidence of prior domestic violence episodes.  Id. at 920-21.

Gunderson appealed the admission of the ER 404(b) evidence, arguing that the probative value of the evidence was outweighed by its significant prejudicial effect. Id. at 923. Our Supreme Court agreed. Id. The court acknowledged that a history of domestic violence can be probative of a witness's credibility in cases where that witness has given conflicting statements about the defendant's conduct but ruled that such evidence is not equally probative in cases were a witness does not recant or give a conflicting account of events. Id. 923-24. Because the ex-girlfriend had neither recanted nor given a conflicting account of events, the Supreme Court concluded the evidence of prior domestic violence incidents was more prejudicial than probative. Id. at 926.

The Ashley court found Gunderson to be distinguishable:

> Our opinion [in Gunderson] was careful to balance the heightened prejudicial effects of domestic violence against the recognition that the probative value of such evidence could outweigh its prejudicial effects in certain circumstances. . . .
> . . . .
>
> Here, the evidence was properly introduced to explain how [the victim] could be intimidated by Ashley, which goes directly to the element of restraint without consent.

186 Wn.2d at 46-47. Here, as in Ashley, the ER 404(b) evidence was relevant to proving an element of the crime charged—whether the restraint was without R.R.'s consent. And unlike Gunderson, the trial court did not admit the ER 404(b) evidence to bolster R.R.'s credibility.

The trial court did not abuse its discretion in admitting evidence of Tayler's prior acts of domestic violence because they were relevant to the restraint element of the charge of unlawful imprisonment and to the domestic violence aggravator.

3. Due Process Notice of Aggravating Factor Evidence

Tayler next contends that the trial court violated his due process rights by admitting evidence that he threatened to use a baseball bat against R.R.'s son if the son tried to help R.R. move out. We see no due process violation in admitting evidence about which Tayler had notice before trial.

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, specifies that the State may give notice that it intends to seek a sentence above the standard range "[a]t any time prior to trial or entry of the guilty plea," and that "[t]he notice shall state [the] aggravating circumstances upon which the requested sentence will be based." RCW 9.94A.537(1). Before trial, the State filed a written notice of its intention to introduce ER 404(b) evidence, and listed six incidents of Tayler's prior misconduct. Shortly thereafter, the State amended the information to include the aggravating circumstance under RCW 9.94A.535(3)(h)(i).[4] In the accompanying supplemental affidavit of probable cause, the State listed the same six incidents to support the charged aggravator.

While R.R. was testifying about her history with Tayler generally, the State asked her if she had considered leaving Tayler. R.R. responded "I didn't, I was afraid because he, Floyd said that if, if [R.R.'s son] came to help me move, that he would, he would hit him with a baseball bat." Neither the ER 404(b) notice nor the

---

[4] The amended information read:

The State further alleges the following aggravating circumstance [sic] exist pursuant to RCW 9.94A.535(3)(h): The current offense involved domestic violence, as defined in RCW 10.99.020, or stalking, as defined in RCW 9A.46.110, and the following was present: (i) The offense was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim or multiple victims manifested by multiple incidents over a prolonged period of time.

affidavit of probable clause included this incident.  He argues while the State notified Tayler of its intent to offer domestic violence incidents, it failed to notify him that it intended to support the charged domestic violence aggravator, thereby violating his due process rights.

Tayler objected to this evidence as ER 404(b) evidence not disclosed by the State in its written notice.  The court sustained the objection and the State moved on to a different topic.  Tayler then moved for a mistrial, arguing that the baseball bat comment was so prejudicial that it would be impossible to "unring that bell."  Tayler also argued that if the evidence was admissible to prove the aggravating factor, then his due process right to pretrial notice was violated pursuant to State v. Siers, 174 Wn.2d 269, 277, 274 P.3d 358 (2012) (plurality opinion).  After receiving additional briefing from the parties, the court rejected Tayler's due process argument, concluding that Siers required the State to provide Tayler with notice of the aggravating factor the State intended to prove at trial, which it had done here, and did not require pretrial notice of every fact the State intended to offer to prove that aggravating factor.  The court also specifically found that R.R.'s statement regarding the baseball bat threat was contained in discovery produced to Tayler.  The court denied Tayler's motion for a mistrial, finding the evidence admissible.

Tayler renews his due process claim on appeal.  The due process clause of the state and federal constitutions require defendants to receive adequate notice of the nature of the charges against them in order to prepare a defense.  U.S. CONST. amend VI; WASH. CONST., art. I, § 22.  A defendant must receive pretrial

- 19 -

notice of the State's intent to prove an aggravating circumstance listed in RCW 9.94A.535. Siers, 174 Wn.2d at 277. "Due process is satisfied when the defendant receives sufficient notice from the State to prepare a defense against the aggravating circumstances that the State will seek to prove in order to support an exceptional sentence." Id. at 278. We review Tayler's due process claim de novo. Id. at 274.

We conclude Tayler received sufficient notice from the State of the aggravating circumstances the State intended to prove to support an exceptional sentence. First, the first amended information informed Tayler that the State intended to prove that his unlawful imprisonment of R.R. was part of an ongoing pattern of psychological and physical abuse under RCW 9.94A.535(3)(h). Second, Tayler received notice during discovery that R.R. alleged she had not left the relationship because he had threatened to harm her son with a baseball bat. Third, Tayler conceded below that he conducted a pretrial interview of R.R. after learning of her disclosure in a police report, and he had the opportunity to question her about the allegation. Under these circumstances, we cannot conclude Tayler's due process rights were violated. Siers does not require a contrary result.

4. Bifurcation

Tayler next argues that the trial court erred in denying his request to bifurcate the trial to have the jury decide if Tayler was guilty of unlawful imprisonment before it considered whether he had committed prior acts of domestic violence. We disagree.

- 20 -

A defendant is not entitled to a bifurcated trial, State v. Roswell, 165 Wn.2d 186, 197, 196 P.3d 705 (2008), and they are generally not favored in Washington. State v. Kelley, 64 Wn. App. 755, 762, 828 P.2d 1106 (1992). Bifurcation is inappropriate if there is a substantial overlap between evidence relevant to the proposed separate proceedings or if a single proceeding would not significantly prejudice the defendant. State v. Monschke, 133 Wn. App. 313, 335, 135 P.3d 966 (2006). We review a trial court's decision on whether to bifurcate a trial for an abuse of discretion. Roswell, 186 Wn. 2d at 192.

Here, Tayler asked the court to bifurcate trial so the jury would consider the aggravating circumstance only after it found Tayler guilty of unlawful imprisonment. The trial court denied this request, relying on RCW 9.94A.537. Under RCW 9.94A.537(4),[5] if the State intends to present evidence of a pattern of abuse under RCW 9.94A.535(3)(e)(h)(i), the trial court "may" conduct a separate proceeding to determine the facts relating to that allegation but only if the evidence is not otherwise admissible in the trial on the underlying crime. As the trial court correctly noted, the evidence supporting the pattern of abuse was admissible to prove unlawful imprisonment, so the statutory condition precedent for bifurcation did not exist.

---

[5] RCW 9.94A.537(4) provides:

> Evidence regarding any facts supporting aggravating circumstances under RCW 9.94A.535(3) (a) through (y) shall be presented to the jury during the trial of the alleged crime, unless the jury has been impaneled solely for resentencing, or unless the state alleges the aggravating circumstances listed in RCW 9.94A.535(3) (e)(iv), (h)(i), (o), or (t). If one of these aggravating circumstances is alleged, the trial court may conduct a separate proceeding if the evidence supporting the aggravating fact is not part of the res gestae of the charged crime, if the evidence is not otherwise admissible in trial of the charged crime, and if the court finds that the probative value of the evidence to the aggravated fact is substantially outweighed by its prejudicial effect on the jury's ability to determine guilt or innocence for the underlying crime (emphasis added).

Tayler contends the trial court should have bifurcated the jury instructions, even if it did not bifurcate the trial itself. In State v. Oster, 147 Wn.2d 141, 147, 52 P.3d 26 (2002), the Supreme Court held that when an element of a charged crime includes the existence of a prior conviction, a trial court may bifurcate the jury instructions to avoid the risk that a defendant's prior criminal history would taint the jury's verdict on the underlying crime. But the Supreme Court later noted a defendant has no right to bifurcated jury instructions. Roswell 165 Wn.2d at 197. The court concluded that "[i]f a prior conviction is an element of the crime charged, evidence of its existence will never be irrelevant," and denying bifurcation on that basis is not an abuse of discretion. Id. at 198.

Tayler relies on Roswell to argue that the trial court erred in denying his request for bifurcated instructions. But Roswell does not help Tayler here. In that case, the State charged Roswell with child molestation and felony communication with a minor for immoral purposes, an element of which was a prior felony sex offense. 165 Wn.2d at 190. The State also alleged rapid recidivism as an aggravating factor. Id. at 191. At trial, Roswell asked for two different bifurcations. First, Roswell requested that he be allowed to stipulate to the existence of his prior sexual offense convictions and to waive his right to jury on that issue to prevent the jury from being informed of the prior convictions. Id. at 190. The trial court declined this request. Id. He also asked that the rapid recidivism aggravator special verdict form be given to the jury only if it convicted him of the underlying sex offenses, a request the court granted. Id. at 191.

On appeal, Roswell argued he was entitled to waive his right to a jury trial on the prior conviction element of the charged crime. The Supreme Court rejected that argument, holding that a prior sex offense conviction was an essential element of the crime charged and, although a defendant may waive his right to a jury determination of an aggravator, he had no right to do so with regard to a single element of the charged crime. Id. at 192.

Roswell's applicability to this case is questionable as Tayler did not seek to exclude evidence of prior convictions. But both Roswell and Oster are clear that Tayler did not have a right to bifurcated jury instructions and denying a request for bifurcated jury instructions is not an abuse of discretion.

Tayler contends that bifurcated instructions would have eliminated any inconsistency and confusion arising from Jury Instruction No. 17. Jury Instruction No. 17 said:

> Certain evidence has been admitted in this case regarding alleged acts of domestic violence committed prior to June 17, 2019. You may consider these acts only for the following limited purposes.
>
> 1. For determining the state of mind of [R.R.] during the alleged crime of Unlawful Imprisonment, and
> 2. If you find the defendant guilty of Unlawful Imprisonment, for the additional purpose of whether that crime constitutes an Aggravated Domestic Violence Offense.

This instruction is neither inconsistent with any other instruction, nor unduly confusing. It advised the jury that it could consider the ER 404(b) evidence only to determine R.R.'s state of mind during the alleged unlawful imprisonment. It further instructed the jury that if it found him guilty of that crime only then could it consider the same evidence to determine whether there was a pattern of

psychological or physical abuse. The trial court did not abuse its discretion in denying Tayler's request to bifurcate trial or the jury instructions on the aggravator.

    5.   <u>Jury Instruction and Special Verdict Form for Aggravator</u>

Next, Tayler contends the trial court erred in refusing his proposed special verdict form requiring the jury to find whether each of six alleged prior acts of domestic violence had occurred and whether each constituted abuse. We reject this contention because the special verdict forms presented to the jury required it to make the requisite factual findings to support the statutory aggravating circumstance.

We review a trial court's decision regarding a special verdict form under the same standard we apply to decisions regarding jury instructions. <u>State v. Fehr</u>, 185 Wn. App. 505, 514, 341 P.3d 363 (2015). We review claimed legal errors in jury instructions de novo. <u>State v. Barnes</u>, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

Tayler asked the court to instruct the jury that "To find that the offense was part of an ongoing pattern of psychological, physical, or sexual abuse manifested by multiple incidents over a prolonged period of time, you must unanimously agree that the State proved beyond a reasonable doubt the incidents that manifest the ongoing pattern." Tayler proposed a special verdict form that asked the jury to unanimously find whether each alleged prior incident had occurred and whether each prior incident amounted to abuse. The trial court concluded that Tayler's proposed instructions were not accurate statements of the law and denied his proposed instruction and special verdict forms.

- 24 -

Tayler argues that the trial court's failure to give his proposed special verdict forms violated Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988) because the jury did not make unanimous findings as to which acts formed the basis of the pattern of abuse aggravating circumstance. We reject this argument for two reasons.

First, Tayler provides no authority for the proposition that Blakely requires a jury to find unanimously which of Tayler's acts formed the basis for its finding that he engaged in a pattern of abuse. Criminal defendants have a right to a unanimous jury verdict. State v. Sandholm, 184 Wn.2d 726, 732, 364 P.3d 87 (2015) (citing WASH. CONST. art. I, § 21). The State must prove each element of a charged offense beyond a reasonable doubt. State v. Chacon, 192 Wn.2d 545, 549, 431 P.3d 477 (2018) (citing U.S. CONST. amend. XIV). Under Blakely, any fact that increases the penalty above the standard range must also be found by a unanimous jury beyond a reasonable doubt. 542 U.S. at 301; accord Alleyne v. United States, 570 U.S. 99, 108, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (facts that increase a mandatory sentence are, in effect, elements of the charged offense that must be decided by a jury).

The question under Blakely is what "facts" actually increased Tayler's sentence. The domestic violence aggravator, RCW 9.94A.535(3)(h)(i), requires the State to prove that:

> The current offense involved domestic violence, as defined in RCW 10.99.020, or stalking, as defined in RCW 9A.46.110, and one or more of the following was present:

(i) The offense was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim or multiple victims manifested by multiple incidents over a prolonged period of time.

The fact that increased Tayler's sentence here was not any one specific domestic violent incident but the existence of a pattern of abuse.

Jury Instruction No. 16 said

To find that Unlawful Imprisonment is an aggravated domestic violence offense, each of the following two elements must be proved beyond a reasonable doubt:

(1) That the victim and the defendant were family or household members; and

(2) That the offense was part of an ongoing pattern of psychological, physical, or sexual abuse manifested by multiple incidents over a prolonged period of time.

Instruction No. 16 used the statutory language verbatim, was identical in wording to the pattern jury instruction for this aggravator, and was a correct statement of the law. See 11A WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS CRIMINAL: WPIC 300.17 at 902 (5th ed. 2021) (WIPC).

The court presented the jury with two special verdict forms. The first asked whether Tayler and R.R. were members of the same family or household on June 17, 2019. This form corresponded to the first element of Instruction No. 16. The second asked whether the unlawful imprisonment was part of an ongoing pattern of psychological, physical, or sexual abuse manifested by multiple incidents over a prolonged period of time. This form corresponded to the second element of Instruction No. 16. The special verdict forms asked the jury to find, beyond a reasonable doubt, the facts necessary to establish the statutory "pattern of abuse" aggravating circumstance.

Alleyne, on which Tayler relies, is distinguishable. In that case, Alleyne was sentenced to a mandatory minimum sentence of seven years under 18 U.S.C. §924(c)(1)(A), which applies to anyone who "brandished" a firearm during a crime of violence. 570 U.S. at 103. The jury found that Alleyne used or carried a firearm during the crime, but did not find that he brandished the gun. Id. The Supreme Court reversed the sentence because the jury failed to make the factual finding required by statute. Id. at 117. This case is not analogous because Tayler's jury made the necessary statutory finding to support the aggravating circumstance under RCW 9.94A.535(3)(h)(i).

Nor does United States v. Haymond, __ U.S. __, 139 S. Ct. 2369, 204 L. Ed. 2d 897 (2019) support Tayler's special verdict form argument. In that case, Haymond was found guilty of possessing child pornography and sentenced to a prison term of 38 months followed by ten years of supervised release. Id. at 2373. While on supervised release, the government moved to revoke the supervised release, alleging he possessed child pornography. Id. at 2374. A judge determined by a preponderance of evidence that Haymond had knowingly downloaded and possessed child pornography. Id. Under the applicable federal statute, the sentencing judge was required to impose an additional prison term of at least five years regardless of the length of the prison term otherwise authorized for the underlying conviction. Id. at 2375. A district court imposed a five year term and no jury was empaneled to find that Haymond had committed the violation. Id.

A plurality of the Supreme Court held that applying the statute's mandatory minimum sentence violated Haymond's right to a jury trial. Id. at 2384-85. But

Justice Breyer's concurrence was the controlling opinion in Haymond. United States v. Henderson, 998 F.3d 1071, 1076 (9th Cir. 2021). This concurrence significantly narrowed the holding by agreeing with the plurality only on the issue of whether the specific provision of the supervised release statute, 18 U.S.C. §3583(k), which effectively imposed a prison term for a new criminal offense, was unconstitutional. The Ninth Circuit has refused to extend Haymond to other cases in which courts have revoked supervised release under different federal statutes. Henderson, 998 F.3d at 1076. Haymond is simply not applicable here.

Second, although a defendant has a right to a unanimous jury verdict, Kitchen, 110 Wn.2d at 409, and the State must elect the acts on which it relies for a conviction when it presents evidence of several acts that could form the basis of a charged crime or an aggravating circumstance, State v. Price, 126 Wn. App. 617, 646-47, 109 P.3d 27 (2005), abrogated on other grounds by State v. Hampton, 184 Wn.2d 656, 361 P.3d 734 (2015), an election is not required when a continuing course of conduct forms the basis for the charge. State v. Petrich, 101 Wn.2d 566, 571, 683 P.2d 173 (1984); State v. Lee, 12 Wn. App. 2d 378, 394, 460 P.3d 701 (2020).

This court has previously held that the pattern of abuse aggravating circumstance of RCW 9.94A.535(3)(h)(i) contemplates an ongoing course of conduct rather than a single action because a "'pattern' requires more than one act occurring in an ongoing scenario." State v. Bell, No. 62552-7-I, noted at 159 Wn. App. 1002 at *17 (2010) (unpublished).[6] In Bell, we rejected the argument

---

[6] Under GR 14.1(c), we cite this case here because doing so is necessary to this reasoned decision.

that the defendant was entitled to a unanimous jury verdict as to which acts formed the basis for the pattern of domestic violence abuse, holding "[u]nanimity was only required as to Bell's course of conduct, not a particular action." Id. We find the reasoning of Bell persuasive and conclude that Tayler was not entitled to a unanimous jury verdict as to which of the alleged acts of psychological and physical abuse occurred and which acts were part of his pattern of abuse.

The trial court did not violate Blakely or Kitchen by rejecting Tayler's proposed special verdict forms.

6. Sufficiency of Evidence of Aggravating Factor

Tayler argues there was insufficient evidence to support the jury's finding of a pattern of abuse. We disagree.

We review the sufficiency of the evidence for an aggravating factor in the same way we review it for the elements of a crime. State v. Burrus, 17 Wn. App. 2d 162, 171, 484 P.3d 521 (2021). "'Under this standard, we review the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the presence of the aggravating circumstances beyond a reasonable doubt.'" Id. (quoting State v. Zigan, 166 Wn. App. 597, 601-02, 270 P.3d 625 (2012)). We defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Linden, 138 Wn. App. 110, 117, 156 P.3d 259 (2007).

It is unclear whether Tayler is challenging the legal sufficiency of the evidence or R.R.'s credibility, as he appears to argue that some of R.R.'s testimony was too "weak" to support a finding of abusive conduct. We will not reweigh R.R.'s

testimony. We must assume that R.R.'s version of the prior domestic violence events is true. Under this framework, there is ample evidence that Tayler engaged in abusive behavior on multiple occasions between the time Tayler and R.R. started dating in July 2018 and the date he unlawfully imprisoned her in July 2019. Any rational trier of fact could have found beyond a reasonable doubt that these multiple incidents constituted a pattern of psychological or physical abuse. See State v. Brush, 5 Wn. App. 2d 40, 54-55, 425 P.3d 545 (2018) (criticism of another that is hurtful, mocking comments, threats that do not rise to the level of true threats, and vulgar insults can constitute psychological abuse).

Tayler suggests that we should evaluate the sufficiency of the evidence as we would when addressing an alternative means of committing a crime. Under this rule, a defendant may have the right to a unanimous jury determination as to the means by which they committed a crime when they are charged with an alternative means crime. State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). In reviewing this type of challenge, courts apply the rule that when there is sufficient evidence to support each of the alternative means of committing the crime, express jury unanimity as to which means is not required. Id. If, however, there is insufficient evidence to support any means, a particularized expression of jury unanimity is required. Id.

But this rule only applies to alternative means statutes. An alternative means crime is one "that provide[s] that the proscribed criminal conduct may be proved in a variety of ways." State v. Smith, 159 Wn.2d 778, 784, 154 P.3d 873 (2007). Alternative means describe distinct acts that amount to the same crime.

State v. Espinoza, 14 Wn. App. 2d 810, 819, 474 P.3d 570 (2020) (citing State v. Barboza-Cortes, 194 Wn.2d 639, 644, 451 P.3d 707 (2019)). But where there are alternative ways to satisfy each alternative means (i.e., "a means within a means"), the alternative means doctrine does not apply. Smith, 159 Wn.2d at 783 (quoting In re Pers. Restraint of Jeffries, 110 Wn.2d 326, 339, 752 P.2d 1338 (1988)).

RCW 9.94A.535(3)(h)(i) does not describe distinct acts amounting to a pattern of abuse. While the statute talks about psychological, physical or sexual abuse, the State does not have to elect which form of abuse it contends occurred. Indeed, all three forms of abuse can be a part of the same pattern. The statute only requires that the jury find, and be unanimous in finding, that there was a pattern. Because RCW 9.94A.535(3)(h)(i) is not an alternative means statute, the jurors did not need to unanimously agree as to which specific incidents occurred and which ones did not. Sufficient evidence supports the jury finding of abuse.

7. "True Threat" Instruction

Tayler next argues the trial court erred in denying his proposed jury instruction defining a "true threat." We reject this argument.

We review a challenge to a jury instruction de novo, evaluating the jury instruction "in the context of the instructions as a whole." State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). "Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." Barnes, 153 Wn.2d at 382.

Tayler requested that the jury be instructed that "[a] true threat is a statement made in a context or under such circumstances where a reasonable

person would foresee that the statement would be interpreted as a serious expression of intention to carry out the threat." He argued this instruction was necessary for the jury to determine whether Tayler had actually restrained R.R. by threatening her. The trial court declined his request, concluding that Tayler was still able to argue his theory of the case without it and that it was not relevant to an element the State had the burden of proving.

A trial court must give the jury an instruction defining "true threats" when crimes prohibiting threatening language, such as felony harassment, bomb threats, telephone harassment, and the intimidation of a judge or other public servant. State v. Clark, 175 Wn. App. 109, 114, 302 P.3d 553 (2013); State v. Tellez, 141 Wn. App. 479, 483-84, 170 P.3d 75 (2007); see also State v. Dawley, 11 Wn. App. 2d 527, 455 P.3d 205 (2019). Tayler has identified no case in which a court has held that a true threat instruction is needed when the charge is unlawful imprisonment.

In order to establish unlawful imprisonment, the State had to prove that Tayler knowingly (1) restrained R.R.'s movements in a manner that substantially interfered with her liberty; (2) that such restraint was (a) without R.R.'s consent or (b) accomplished by physical force, intimidation, or deception; and (3) without legal authority. RCW 9A.40.040; RCW 9A.40.010(6). Tayler argues that because the State based its case on the theory that Tayler intimidated R.R. into remaining in the trailer against her will, rather than using force to do so, he can be criminally liable for this intimidation only if it rose to the level of a true threat and the State proved he intended to intimidate her.

The question, not addressed by Tayler, is whether the unlawful imprisonment statute regulates pure speech such that it "must be interpreted with the commands of the First Amendment clearly in mind." Dawley, 11 Wn. App. 2d at 537 (quoting State v. Williams, 144 Wn.2d 197, 206-07, 26 P.3d 890 (2001)) (internal quotations omitted). A statute that criminalizes pure speech is constitutionally overbroad and can survive a challenge by limiting its reach to true threats. Id. at 541. If, however, the crime is a mixed conduct and speech crime, "'a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.'" Id. at 542 (quoting State v. Strong, 167 Wn. App. 206, 215, 272 P.3d 281 (2012)).

The key issue is whether the statute's objective is to regulate conduct, with only an incidental impact on speech. Strong, 167 Wn. App. at 215. In Strong, Division Three of this court rejected an argument that the extortion statute was an unconstitutional infringement on pure speech. It reasoned:

> A threat falling short of a true threat will be protected from punishment as pure speech. But when the threat is a part of verbal and other conduct whose criminal punishment can be justified independent of the speech, the wrong, collectively, is not guaranteed protection from criminal punishment.

Id. at 219-20 (citations omitted). We conclude that the unlawful imprisonment statute's objective is to regulate conduct—forcing someone to remain in a place they do not wish to be. The fact that this restraint may occur through threatening words does not render the statute overly broad or violate the First Amendment such that a true threat instruction is required. The trial court did not abuse its discretion in rejecting Tayler's proposed true threat instruction.

8. <u>Jury Unanimity Instruction</u>

Tayler argues that the trial court erred in giving Instruction No. 18 because it did not require jury unanimity to reject the alleged aggravating circumstance, as required. <u>State v. Guzman Nuñez</u>, 174 Wn.2d 707, 285 P.3d 21 (2012). Here, the trial court instructed the jury that

> In order to answer the special verdict forms "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you unanimously agree that the answer to the question is "no," or if after full and fair consideration of the evidence you are not in agreement as to the answer, you must fill in the blank with the answer "no."

Thus, the jury assumed it did <u>not</u> need to be unanimous to reject the State's pattern of abuse allegation. In <u>Guzman Nuñez</u>, our Supreme Court held that unanimity is required to answer either "yes" or "no" on an aggravating factor special verdict form. 174 Wn.2d at 716-17. The State concedes that Instruction No. 18 was incorrect under <u>Guzman Nuñez</u>.

Even had Tayler preserved this issue for appeal,[7] he has not demonstrated that the error caused him any actual prejudice. In fact, the instruction operated to Tayler's advantage. Because the jury was instructed it had to be unanimous to conclude that that the aggravator had been proven, but did not have to be unanimous to reject it entirely, the erroneous instruction did not relieve the State of its burden to prove each element of the aggravating factor beyond a reasonable

---

[7] We question whether Tayler failed to preserve this issue for appeal. Failure to timely object usually waives the issue on appeal, including issues regarding instructional errors. RAP 2.5(a). Tayler objected to the instruction, based on the court's refusal to bifurcate the special verdict form on the sentencing aggravator, but did not argue that jury unanimity was needed to answer "no" on the alleged aggravator. <u>See</u> <u>State v. Loos</u>, 14 Wn. App. 2d 748, 757, 473 P.3d 1229 (2020) ("If a defendant raises one objection to an instruction at the trial level, but then challenges an instruction on different legal grounds for the first time on appeal, this court will not consider the new argument.").

doubt and was therefore harmless.  See State v. Brown, 147 Wn.2d 330, 344, 58 P.3d 889 (2002) (erroneous jury instruction omitting or misstating element is subject to harmless error to determine if error relieved State of burden to prove each element).

9. Judicial Discretion to Impose an Exceptional Sentence

Finally, Tayler argues his sentence violates the Sixth Amendment because the sentencing court has "unrestrained discretion" to accept or reject a jury finding of an aggravating factor and to decide the length of an exceptional sentence based on the jury's finding.[8]  Tayler contends that under Alleyne and Hurst v. Florida, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), a jury must not only find whether an aggravating circumstance exists but must also determine the sentence to be imposed.  Neither case applies here.

Under the SRA, if a jury unanimously finds beyond a reasonable doubt the existence of "one or more of the facts alleged by the state in support of an aggravated sentence," the court may impose an exceptional sentence "if it finds, considering the purposes of this chapter, that the facts found [by the jury] are substantial and compelling reasons justifying an exceptional sentence."  RCW 9.94A.537(6).  "[O]nce the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, '[t]he trial judge [is] left only with the legal conclusion of whether the facts

---

[8] The State argues that we should decline to address this issue because Tayler failed to raise it below.  However, errors implicating a criminal defendant's Sixth Amendment right to a jury trial may be raised for the first time on appeal.  State v. Hughes, 154 Wn.2d 118, 143, 110 P.3d 192 (2005), abrogated on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006); State v. O'Connell, 137 Wn. App. 81, 89, 152 P.3d 349 (2007).  Thus, we address it on its merits.

alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence.'" State v. Sage, 1 Wn. App. 2d 685, 708, 407 P.3d 359 (2017) (quoting State v. Suleiman, 158 Wn.2d 280, 290-91, 143 P.3d 795 (2006)).

If the jury finds an aggravating circumstance beyond a reasonable doubt, and the trial court concludes that the finding is a substantial and compelling departure from the standard sentencing range, the sentencing court is permitted to use its discretion to determine the precise length of an exceptional sentence. State v. Oxborrow, 106 Wn.2d 525, 530, 723 P.2d 1123 (1986). This discretion is not absolute; any exceptional sentence may not exceed the maximum allowed by RCW 9A.20.021 for the underlying conviction. RCW 9.94A.537(6). Any exceptional sentence is subject to review to ensure that the reasons given by the court for the sentence are supported by the record, or that the sentence is not clearly excessive. RCW 9.94A.585(4).

Unlawful imprisonment is a Class C felony, the maximum sentence for which is five years in prison and a $10,000 fine. RCW 9A.40.040(2), RCW 9A.20.021(1)(c). Tayler's sentence of twelve months and a day does not exceed the five years maximum allowed by law. Nor does he assign error to the sentence as unsupported by the record or clearly excessive.

Instead, Tayler contends the jury must decide the duration of his sentence. But neither Alleyne nor Hurst support this argument. As indicated above, the Supreme Court in Alleyne vacated an enhanced prison sentence because, under the Sixth Amendment, whether the defendant had brandished a firearm during the commission of a crime of violence (the fact that increased the statutorily mandated

penalty), had to be decided by a jury, not the sentencing court. 570 U.S. at 115. Alleyne did not address whether the Sixth Amendment places any limits on a sentencing court's discretion to determine the length of an enhanced sentence when that discretion is conferred by statute.

Nor does Hurst address this issue. In that case, the Supreme Court considered the constitutionality of Florida's death penalty statute that employed a hybrid proceeding in which a jury rendered an advisory sentence of life or death without specifying the factual basis for its recommendation and the sentencing court then weighed aggravating and mitigating circumstances and decided whether to impose a death sentence. 577 U.S. at 95-96. The court invalidated the statutory process under the Sixth Amendment because the jury did not make factual findings as to the existence of any aggravating circumstances. Id. at 98.

Tayler argues that, under Hurst, the aggravator must be linked to a sentence imposed with no discretion given to the trial judge. Otherwise, he contends, the sentence permitted under the Washington sentencing scheme becomes "untethered to the jury determination of the aggravator factor." But the issue in Hurst was not that the trial court was given discretion to decide what sentence to give. The issue was that the jury never made factual findings with regard to the existence of mitigating or aggravating circumstances and the trial court had no jury findings on which to rely when exercising its sentencing discretion. Id. at 99-100.

Washington's sentencing procedure does not suffer from the defect found in Hurst. RCW 9.94A.537 mandates that a jury must determine whether an

aggravating factor exists and the State must prove that aggravating circumstance beyond a reasonable doubt. The trial court's conclusion that an exceptional sentence was warranted did not violate the Sixth Amendment.

We affirm.

_Andrus, A.C.J._

WE CONCUR:

_Mann, C.J._

_Verellen, J._